# AMES *v.* KANSAS *ex rel.* JOHNSTON, Attorney-General.

# KANSAS PACIFIC RAILWAY COMPANY *v.* KANSAS *ex rel.* JOHNSTON, Attorney-General.

### IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

Argued March 7th, 10th, and 11th, 1884.—Decided April 21st, 1884.

*Constitutional Law—Quo Warranto—Removal of Causes—Statutes.*

The remedy by information in the nature of *quo warranto*, though criminal in form, is in effect a civil proceeding.

A statute abolishing the common-law proceeding by information in the nature of *quo warranto*, and authorizing an action to be brought in cases in which that remedy was applicable, makes the proceeding a civil action for the enforcement of a civil right, subject to removal from State courts to the courts of the United States when other circumstances permit.

Proceedings by a State against a corporation created under its own laws, in the nature of *quo warranto* for the abandonment, relinquishment and surrender of its powers to another corporation with which it has been consolidated under a law of the United States, and proceedings against the directors of said consolidated company for usurping the powers of such State corporation are, when in the form of civil actions, suits arising under the laws of the United States within the meaning of the acts regulating the removal of causes.

When a suit brought by a State in one of its own courts against a corporation amenable to its own process, to try the right of the corporation to exercise corporate powers within the territorial limits of the State, presents a case arising under the laws of the United States, it may be removed to the Circuit Court of the United States if the other jurisdictional conditions exist.

In view of the practical construction put upon the Constitution by Congress and the courts in the statutes and decisions cited in the opinion, the Court is unwilling to say that it is not within the power of Congress to grant to inferior courts of the United States jurisdiction in cases where the Supreme Court has been vested by the Constitution with original jurisdiction.

The judiciary act of March 3d, 1875, 18 Stat. 470, does not confer upon Circuit Courts jurisdiction over causes in which the jurisdiction of the Supreme Court is made exclusive by § 687 Rev. Stat.

Suits cognizable in the courts of the United States on account of the nature of the controversy, and which are not required to be brought originally in the Supreme Court, may be brought in or removed to the Circuit Courts from State courts without regard to the character of the parties. The reasoning and language in *Cohens v. Virginia,* 6 Wheat. 397, concerning appellate jurisdiction of the Supreme Court, adopted and applied to the jurisdiction of Circuit Courts over causes in which a State is a party, commenced in a State court and removed to a Circuit Court.

Each of these writs of error brought up for review an order of the Circuit Court remanding a case to the State court from which it had been removed, and the two cases were considered together. The material facts were these :

The Leavenworth, Pawnee and Western Railroad Company was incorporated by the Legislature of the Territory of Kansas in 1855, to build a railroad from the west bank of the Missouri River, in the town of Leavenworth, to or near Fort Riley, and from thence to the western boundary of the Territory, which was the east boundary of Utah on the summit of the Rocky Mountains. 10 Stat. 283, c. 59, sec. 19. In 1857 this act was amended so as to authorize the construction of a branch from some favorable point on the main line to some point on the southern boundary of the Territory, where an easy connection could be made with a line of road extending to the Gulf of Mexico, and also of a branch to the northern boundary of the Territory. The company was organized under these acts in 1857, and before January 1st, 1862, had located its line from Leavenworth to Fort Riley, and had, to a large extent, secured its right of way and depot grounds.

On the 1st of July, 1862, the first Pacific Railroad act was passed by Congress, incorporating the Union Pacific Railroad Company, and providing for government aid in the construction of the several roads brought into the system, which was then inaugurated to establish a railroad connection between the Atlantic and Pacific coasts. 12 Stat. 489, c. 120. By sec. 9 of this act the Leavenworth, Pawnee and Western Railroad Company of Kansas was authorized to construct a railroad and telegraph line from the Missouri River, at the mouth of the Kansas River, on the south side thereof, so as to connect with the Pacific Railroad of Missouri, to the point in the Territory of Nebraska, then established as the eastern terminus of the Union Pacific Road. Provision was made for government aid to this company in all repects like that to the Union Pacific. Sec. 16 is as follows :

"That at any time after the passage of this act all of the railroad companies named herein, and assenting hereto, or any two

or more of them, are authorized to form themselves into one consolidated company ; notice of such consolidation, in writing, shall be filed in the Department of the Interior, and such consolidated company shall thereafter proceed to construct said railroad and branches and telegraph line upon the terms and conditions provided in this act."

The Leavenworth, Pawnee and Western Company accepted the provisions of this act, and was thereafter designated as the Union Pacific Railroad Company, Eastern Division. By the act of July 2d, 1864, c. 216, sec. 12, 13 Stat. 361, the company was required to build its railroad from the mouth of the Kansas by way of Leavenworth, or, if that was not deemed the best route, to build a branch from Leavenworth to the main stem at or near Lawrence. This act also made provision, by sec. 16, for the consolidation of any two or more corporations embraced in the system, upon such terms and conditions as they might agree upon not incompatible with the laws of the States in which the roads of the companies might be. On the 3d of July, 1866, c. 169, 14 Stat. 80, the company was permitted to make its connection with the Union Pacific at any point not more than fifty miles westerly from the meridian of Denver. By another act passed March 3d, 1869, c. 324, 15 Stat. 324, the company was authorized to extend its road to Denver, in the Territory of Colorado, and from there to make its connection with the Union Pacific at Cheyenne, over the road of the Denver Pacific Railway and Telegraph Company,. a Colorado corporation, power being given to contract with the last named company for that purpose. On the same day a joint resolution was passed by Congress, No. 23, 15 Stat. 348, authorizing the Union Pacific Railroad Company, Eastern Division, by a resolution of its directors, filed in the office of the Secretary of the Interior, to change its name to the Kansas Pacific Railway Company.

Under this authority the road was built from its junction with the Missouri Pacific Railroad in Kansas City, Missouri, through Fort Riley, in Kansas, to Denver, in Colorado, and government aid was furnished it under the acts of Congress.

From Denver it formed its connection with the Union Pacific road at Cheyenne, over the road of the Denver Pacific Company. It also built a branch from Leavenworth to Lawrence, but the road from Fort Riley to the original eastern terminus of the Union Pacific was never constructed.

On the 24th of January, 1880, the Union Pacific Railroad Company, the Kansas Pacific Railway Company, and the Denver Pacific Railway and Telegraph Company, acting under the authority of sec. 16 of the Pacific Railroad act of July 1st, 1862, and sec. 16 of the act of July 2d, 1864, entered into an agreement for the consolidation of the three corporations into one, by the name of the Union Pacific Railway Company, and from that time the road of the Kansas Pacific Company, including that portion which lies in Kansas, has been operated and managed as the Kansas Division of the Union Pacific Railway Company.

At the first session of the legislature of Kansas after this consolidation was effected, a resolution was passed directing the Attorney-General to inquire into its legality, and to report whether in his opinion the consolidated company was amenable to the laws of the State; whether the Union Pacific Railroad Company had usurped or was exercising rights and franchises within the State not authorized by law, or had in any manner failed to comply with or had violated any of the laws of the State; whether the Kansas Pacific Company was in law an existing corporation of the State; and whether the State had lost jurisdiction over the property of the corporation. At the next session another resolution was passed, directing the Attorney-General to institute proper proceedings in the Supreme Court of the State, "in the nature of *quo warranto*, against the Kansas Pacific Railway Company for an abandonment, relinquishment, and surrender of its powers as a corporation to such consolidated company, and also to institute like proceedings against the consolidated company, the Union Pacific Railway Company, for usurping, seizing, holding, possessing, and using the franchise and privileges, powers and immunities of the Kansas Pacific Railway Company in the State of Kansas."

Under these instructions the present suits were brought in

the Supreme Court of the State. The petition against the Kansas Pacific Company set forth the acts of the Territorial legislature of Kansas incorporating the company and extending its powers, passed in 1855 and 1857; the organization of the company under its charter; the acts of Congress, passed July 1st, 1862, and July 2d, 1864, granting aid to the company; and the construction of the road. It then averred

"That on the 24th of January, 1880, the said Kansas Pacific Railway Company wrongfully and unlawfully attempted to consolidate its said corporation with the Union Pacific Railroad Company, a corporation chartered under the said acts of Congress of 1862 and 1864, whose line runs from the Missouri River at or near Omaha, Nebraska, to Ogden, in Utah Territory, and the Denver Pacific Railway and Telegraph Company, whose line begins at the city of Denver, in the State of Colorado, and runs in a westward direction to a junction with the Union Pacific Railroad Company, at a place called Cheyenne, in the Territory of Wyoming. And the said Kansas Pacific Railway Company unlawfully and wrongfully attempted to confer upon the said consolidated company all of its franchises, immunities, liberties and privileges granted by virtue of its charter aforesaid, and to merge the same into a pretended corporation, not created by the laws of the Territory or State of Kansas, nor owing any duty to the Territory or State of Kansas, but a pretended corporation, created, if at all, by acts of Congress, and amenable only to federal control, and subject only, as to its rights and the causes of action which might thereafter exist against it, to the jurisdiction of the federal tribunals. And the said Attorney-General gives the court further to understand and be informed, that the said Kansas Pacific Railway Company unlawfully and wrongfully entered into articles of consolidation with said Union Pacific Railroad Company and the said Denver Pacific Railroad and Telegraph Company, which were expressly in violation of its charter, and in conflict with the duties and obligations owing by it to the State of Kansas under the provisions and terms of its charter aforesaid; and further, that said articles were in conflict with the laws of the State of Kansas respecting railroad corporations and the right of railroad companies to consolidate, and were not compatible with such laws."

The bill then set forth a copy of the articles of consolidation, from which it appeared that the sole and only authority relied on for the consolidation was that contained in the several acts of Congress, and that the intent of the parties was to organize the company thereby formed " under the said acts of Congress, and to make the said acts of Congress the charter or constituent acts of this company, as fully as if the same were incorporated herein at large." The contract then appointed directors of the new company, and the place for holding the annual meeting of stockholders, until otherwise ordered, was fixed at the company's office in the city of New York. The then existing by-laws of the Union Pacific Railroad Company were also provisionally adopted and made applicable to the new company.

The bill then averred that it was the duty of the Kansas Pacific Company to make certain reports to the Secretary of State of Kansas, which it had wholly failed to do, and that it held " its general offices and all accounts of its operations, at the general offices of said pretended consolidated company, at the city of Omaha, in the State of Nebraska, and alleges and pretends that the said corporation, the Kansas Pacific Railway Company, no longer owes any duty under its charter as aforesaid to the State of Kansas, but that it is controlled as to its chartered obligations by the acts of Congress creating the Union Pacific Railroad Company, and by the unlawful articles of consolidation aforesaid." It then charged that the company had violated the laws of the State by failing to keep its general offices for the transaction of business within the State, and removing them to Omaha and placing " the same under the absolute order, control and disposal of the said pretended consolidated company." Then it alleged that the road of the Kansas Pacific Company was run as the " Union Pacific Railway Company, Kansas Division," and managed by the new corporation ; that " since the pretended consolidation as aforesaid the said Kansas Pacific Company has wholly failed and neglected to designate some person residing in each county into which its said line of railroad runs, or in which its said business is transacted, on whom all process and notices issued

by any court of record, or justices of the peace of such county, may or might be served," and that it had also failed from the same time " to file a certificate of the appointment or designation of such person in the office of the clerk of the District Court of the county in which such person resides."

The consolidation was afterwards attacked because the roads were originally competing roads, and did not connect at the State line so as to form a complete and continuous line of railway. The next allegation was that the Kansas charter was forfeited by the diversion of the road " to the use of a foreign corporation, outside of the jurisdiction of the State of Kansas, and beyond the reach of her authorities, with the declared intent that it shall be operated, and used, and worked, not according to the laws of Kansas, made or to be made to protect the rights of her people, but under and according to the provisions of other laws, alleged to have been enacted by the legislature of another government, for the regulation of another railroad, lying in another State."

The prayer was that the

" Kansas Pacific Railway Company . . . be made to answer to the State of Kansas by what warrant it claims to have, use, and enjoy the liberties, privileges, and franchises aforesaid; and further, by what warrant it claims and has exercised the right to put said railroad and its appurtenances into the possession and under the control of the above mentioned foreign railroad company, and by what right it claims to maintain such foreign corporation in such possession, or in the enjoyment and exercise of the franchises and privileges bestowed by the State of Kansas exclusively on said Kansas Pacific Railway Company; and that . . . the said respondent company be adjudged to have forfeited all its rights, liberties, and franchises, and to be ousted from the same, and that the corporation be thereupon dissolved; and that it be further adjudged that the said franchises granted to the defendant by the State have become relinquished, abandoned, and forfeited to the State of Kansas, and that the same be resumed to the State, and that the State take possession of the said railroad, with all its appurtenances and fixtures, as public property, and make such disposition thereof as may be thought

necessary to secure the rights of the State, saving the just interests of creditors and other third parties guiltless of the frauds, wrongs, and injuries herein charged against the corporation and the members thereof."

The answer of the defendant, which, for the purposes of the suit, appeared in the name of the Kansas Pacific Railway Company, admitted the consolidation and set up the authority for that purpose under the laws of Congress. All violations of the laws of Kansas were denied, and the position was distinctly assumed that the Kansas Pacific Company became, under the legislation of Congress, a corporation of the United States, and as such had full authority to enter into the agreement of consolidation which is complained of.

The petition against the individuals who, as was alleged, called themselves the board of directors of the Union Pacific Railway Company, charged them with using, without warrant, charter, or grant, the liberties, privileges, and franchises of being a railroad company to use and operate the railroad of the Kansas Pacific Company, and averred that that road was built under the Kansas charter of the Leavenworth, Pawnee and Western Company. The prayer was that they might be made

" To answer to the State by what warrant they claim to have, use, and enjoy the liberties, privileges, and franchises aforesaid ; and that upon a due hearing hereof the said defendants and said pretended railroad company be adjudged to have unlawfully and wrongfully usurped and appropriated the rights, liberties, privileges, and franchises aforesaid, and to be wrongfully and unlawfully using, enjoying, and exercising the same, and that they be ousted therefrom."

The answers of the defendants set up the legislation of Congress affecting the original Kansas corporation and the consolidation of that company with the Union Pacific and Denver Pacific Companies under that authority. They asserted their right and that of the Union Pacific Railway Company, whose directors they were, to exercise within the State of Kansas all

the powers, and to enjoy all the franchises and privileges, of the old Kansas Pacific Company, and this by reason of the consolidation of that company, under the authority of Congress, with the other two companies.

The directors were all citizens of States other than Kansas.

As soon as the answers were put in, petitions were filed by the defendants in each case for the removal of the suit against them respectively, to the Circuit Court of the United States for the District of Kansas. The petition of the railroad company alleged as ground for removal, 1, that the suit was one arising under the Constitution and laws of the United States; and, 2, that the defendant was a corporation, other than a banking association, organized under a law of the United States, and that it had a defence arising under the laws of the United States. That of the directors was also put on the ground, 1, that the suit was one arising under the Constitution and laws of the United States; and, 2, that the directors were sued as members of a corporation, organized under an act of Congress, for an alleged liability of the corporation, and that their defence arose under and by virtue of the laws of the United States.

Each suit was duly docketed in the Circuit Court of the United States, and, on motion of the State, remanded to the Supreme Court of the State.

From these orders to remand the railway company and the directors, respectively, took a writ of error to this court.

*Mr. John F. Dillon* and *Mr. Wager Swayne* for plaintiffs in error.

*Mr. Clarence Seward, Mr. W. A. Johnston,* Attorney-General of the State of Kansas, and *Mr. W. H. Rossington* for defendant in error, contended that the original jurisdiction given by the Constitution to the Supreme Court in cases in which a State shall be a party excluded a Circuit Court from such jurisdiction. They supported the contention by an elaborate historical argument which cannot be condensed within permissible limits. They also cited the following decisions

in this court and by judges of this court in circuit. *Chisholm* v. *Georgia*, 2 Dall. 419, 425; *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 720; *Osborn* v. *United States*, 9 Wheat. 738, 820; *Gittings* v. *Crawford*, Taney's Dec. 1; *Wisconsin* v. *Duluth*, 2 Dill. 406, 412; *Olmstead's Case*, Brightly, 25; *Georgia* v. *Madrazo*, 1 Pet. 110, 124; *Ex parte Juan Madrazzo*, 7 Pet. 627; *Alabama* v. *Wollfe*, 18 Fed. Rep. 836; *Railroad* v. *Harris*, 12 Wall. 65, 86; *Hepburn* v. *Ellzey*, 2 Cranch, 445; *New Orleans* v. *Winter*, 1 Wheat. 91; *Barney* v. *Baltimore*, 6 Wall. 280, 287. Before the passage of the act of 1875, Circuit Courts had no jurisdiction of a controversy between a State and citizens thereof. *Iowa Homestead Company* v. *Des Moines Navigation Company*, 8 Fed. Rep. 97; *Walsh* v. *Memphis*, 6 Fed. Rep. 797; *Dormitzer* v. *Illinois Bridge Company*, 6 Fed. Rep. 217; *Pacific Railroad* v. *Ketchum*, 101 U. S. 289; *Removal Causes*, 100 U. S. 457; and the fact that a State railway corporation had had similar corporate powers conferred upon it by another State was not cause for removal, and did not give jurisdiction to a Circuit Court in a suit brought by the State in one of its own courts against such corporation. *Memphis & Charleston Railroad Company* v. *Alabama*, 107 U. S. 581. An act of consolidation did not so destroy the existence of the consolidated corporations as to withdraw them as separate legal entities from the jurisdiction of the States by which they were originally created. *Tomlinson* v. *Branch*, 15 Wall. 460; *Johnson* v. *Philadelphia, Wilmington & Baltimore Railroad Company*, 9 Fed. Rep. 6, and note; *Horne* v. *Boston*, 18 Fed. Rep. 50; *Graham* v. *Boston, Hartford & Erie Railroad*, 14 Fed. Rep. 753; *Muller* v. *Dows*, 94 U. S. 444, 447; *Central Railroad & Banking Company* v. *Georgia*, 92 U. S. 665. As Circuit Courts had no jurisdiction of a cause to which a State was a party, such a cause, if removed from a State court to a Circuit Court, would be remanded by the latter court even after it had been docketed. *Den ex dem. the State of New Jersey* v. *Babcock*, 4 Wash. C. C. 344. This line of decisions rests upon the Constitution, and that provision in the Judiciary Act of 1789 which is codified in § 687 Rev. Stat. that "The Supreme Court shall have exclusive jurisdiction of

all controversies of a civil nature where a State is a party, except between a State and its citizens," and those codified in § 711. Before the act of 1875, the jurisdiction of the Supreme Court in all civil cases in which a State was a party was exclusive and not to be meddled with by any inferior tribunal. That practical interpretation put upon the Constitution by legislation is in accordance with the interpretation put upon it by its framers. The act of 1875, properly construed, does not repeal these provisions of previous legislation. As to repeals of jurisdictional statutes by implication, the counsel cited *Pryse* v. *Pryse*, L. R. 15 Eq. 86; *National Bank* v. *Harrison*, 8 Fed. Rep. 721; *United States* v. *Mooney*, 11 Fed. Rep. 476; *Venable* v. *Richards*, 105 U. S. 636.

Mr. Chief Justice Waite delivered the opinion of the court. He stated the facts in the foregoing language, and continued:

The right of removal under section 640 of the Revised Statutes, because the Kansas Pacific Railway Company was a corporation organized under the laws of the United States, is not insisted upon in this court, and the only questions presented for our consideration are:

1. Whether the suits are of a civil nature at law or in equity, arising under the laws of the United States; and,

2. Whether, if they are, they can be removed under the act of March 3d, 1875, c. 137, 18 Stat. 470, inasmuch as they were brought by a State to try the right of a corporation and its directors to exercise corporate powers and franchises within the territorial jurisdiction of the State.

Under the first of these questions it is claimed, in behalf of the State, 1, that the suits are not of a civil nature, because they are proceedings in *quo warranto;* and, 2, that they do not arise under the laws of the United States.

In Kansas the writ of *quo warranto*, and the proceeding by information in the nature of *quo warranto*, have been abolished, and the remedies which were obtainable at common law in those forms are had by civil action. Dassler's Comp. Laws, sec. 4192; Code, sec. 652. Such an action may be brought in the Supreme Court when " any person shall usurp, intrude

into, or unlawfully hold or exercise any public office, or shall claim any franchise within this State, or any office in any corporation created by authority of this State," or "when any association or number of persons shall act within this State as a corporation without being legally incorporated," or when any corporation do or admit [omit] acts which amount to a surrender or a forfeiture of their rights as a corporation, or when any corporation abuses its power, or exercises powers not conferred by law. Id. sec. 4193; Code, sec. 653.

By the Code of Civil Procedure, id. sec. 3525; Code, sec. 4, "An action is an ordinary proceeding in a court of justice by which a party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offence." Sec. 3527; Code, sec. 6: "Actions are of two kinds, *first*, civil; *second*, criminal." Sec. 3528; Code, sec. 7: "A criminal action is one prosecuted by the State as a party, against a person charged with a public offence, for the punishment thereof." Sec. 3529; Code, sec. 8: "Every other action is a civil action." Sec. 3531; Code, sec. 10: "The distinction between actions at law and suits in equity, and the forms of all such actions and suits, heretofore existing, are abolished; and in their place there shall be, hereafter, but one form of action, which shall be known as a civil action."

The original common-law writ of *quo warranto* was a civil writ, at the suit of the crown, and not a criminal prosecution. *Rex* v. *Marsden*, 3 Burr. 1812, 1817. It was in the nature of a writ of right by the king against one who usurped or claimed franchises or liberties, to inquire by what right he claimed them (Com. Dig. Quo Warranto A), and the first process was summons. Id. C. 2. This writ, however, fell into disuse in England centuries ago, and its place was supplied by an information in the nature of a *quo warranto*, which, in its origin, was "a criminal method of prosecution, as well to punish the usurper by a fine for the usurpation of the franchise, as to oust him, or seize it for the crown." 3 Bl. Com. 26?. Long before our revolution, however it lost its character as a criminal proceeding in everything except form, and was "applied to the mere purposes of

trying the civil right, seizing the franchise, or ousting the wrongful possessor; the fine being nominal only." ' 3 Bl. Com. *supra; The King* v. *Francis*, 2 T. R. 484; Bac. Ab. Tit. Information D; 2 Kyd on Corp. 439.    And such, without any special legislation to that effect, has always been its character in many of the States of the Union. *Commonwealth* v. *Browne*, 1 S. & R. 385; *People* v. *Richardson*, 4 Cow. 102, note; *State* v. *Hardie*, 1 Iredell Law, 42, 48; *State Bank* v. *State*, 1 Blackf. 267, 272; *State* v. *Lingo*, 26 Mo. 496, 498.    In some of the States, however, it has been treated as criminal in form, and matters of pleading and jurisdiction governed accordingly. Such is the rule in New York, Wisconsin, New Jersey, Arkansas, and Illinois, but in all these States it is used as a civil remedy only. *Attorney-General* v. *Utica Insurance Company*, 2 Johns. Ch. 370, 377; *People* v. *Jones*, 18 Wend. 601; *State* v. *West Wisconsin Railway Company*, 34 Wis. 197, 213; *State* v. *Ashley*, 1 Ark. 279; *State* v. *Roc*, 2 Dutcher, 215, 217.    This being the condition of the old law, it seems to us clear that the effect of legislation like that in Kansas, as to the mode of proceeding in *quo warranto* cases, is to relieve the old civil remedy of the burden of the criminal form of proceeding with which it had become encumbered, and to restore it to its original position as a civil action for the enforcement of a civil right. The right and the remedy are thus brought into harmony, and parties are not driven to the necessity of using the form of a criminal action to determine a civil right.    This has been the construction put upon similar laws in other States. *State* v. *M'Daniel*, 22 Ohio St. 354, 361; *Central & Georgetown Railroad Company* v. *Taylor*, 5 Colorado, 40, 42; *Commercial Bank of Rodney* v. *State*, 4 Sm. & Marsh. 439, 490, 504.    These suits are therefore of a civil nature.

That the records present cases arising under the laws of the United States we do not doubt.    The attorney-general was instructed by the legislature to institute proceedings against the Kansas Pacific Company " for an abandonment, relinquishment and surrender of its powers and duties as a corporation to the consolidated company," and against the consolidated company " for usurping, seizing, holding, possessing, and using

the franchises and privileges, powers and immunities of the Kansas Pacific Railway Company of Kansas." The whole purpose of the suits is to test the validity of the consolidation. The charge is of an unlawful and wrongful consolidation, and from the beginning to the end of the petition against the Kansas Pacific Company there is not an allegation of default that does not grow out of this single act. It is, indeed, alleged that the company has not, since the consolidation, made its proper reports, and has not appointed agents on whom process can be served, and has established its general offices out of the State, but no such averments are made as to the consolidated company, and it is apparent that these specifications are relied on only as incidents of the main ground of complaint.

That the validity of the consolidation, so far as the State is concerned, rests alone on the authority conferred for that purpose by the acts of Congress is not denied. If the acts of Congress confer the authority, the consolidation is valid; if not, it is invalid. Clearly, therefore, the cases arise under these acts of Congress, for, to use the language of Chief Justice Marshall in *Osborn* v. *United States Bank*, 9 Wheat. 825, an act of Congress "is the first ingredient in the case—is its origin—is that from which every other part arises." The right set up by the company, and by the directors as well, will be defeated by one construction of these acts and sustained by the opposite construction. When this is so, it has never been doubted that a case is presented which arises under the laws of the United States. *Cohens* v. *Virginia*, 6 Wheat. 264, 379; *Gold Washing & Water Company* v. *Keyes*, 96 U. S. 201; *Railroad Company* v. *Mississippi*, 102 U. S. 140.

We come now to the question whether a suit brought by a State in one of its own courts, against a corporation amenable to its own process, to try the right of the corporation to exercise corporate powers within the territorial limits of the State, can be removed to the Circuit Court of the United States, under the act of March 3d, 1875, c. 137, if the suit presents a case arising under the laws of the United States. The language of the act is "any suit of a civil nature . . brought in any State court, . . arising under the Constitution or laws of

the United States," may be removed by either party. This is broad enough to cover such a case as this, unless the language is limited in its operation by some other law, or by the Constitution. The statute itself makes no exception of suits to which a State is a party.

Art. 3, sec. 1 of the Constitution provides, that " the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish." Sec. 2. " The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls, . . to controversies between two or more States; between a State and citizens of another State, . . and between a State, or the citizens thereof, and foreign States, citizens, or subjects. . . In all cases affecting ambassadors, other public ministers, and consuls, and those in which a State shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the Congress shall make."

Within six months after the inauguration of the government under the Constitution, the Judiciary Act of 1789, c. 20, 1 Stat. 73, was passed. The bill was drawn by Mr. Ellsworth, a prominent member of the convention that framed the Constitution, who took an active part in securing its adoption by the people, and who was afterwards Chief Justice of this Court. Sec. 13 was as follows: " That the Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature, where a State is a party, except between a State and its citizens; and except also between a State and citizens of other States or aliens, in which latter case it shall have original but not exclusive jurisdiction. And shall have exclusively all such jurisdiction of suits or proceedings against ambassadors, or other public ministers, or their domestics, or domestic servants, as a court of law can have or exercise consistently with the law

of nations; and original, but not exclusive, jurisdiction of all suits brought by ambassadors, or other public ministers, or in which a consul or vice-consul shall be a party." The same act also, by section 9, gave the District Court jurisdiction exclusively of the courts of the several States of suits against consuls or vice-consuls, except for certain offences, and by section 25 conferred upon the Supreme Court appellate jurisdiction for the review, under some circumstances, of the final judgments and decrees of the highest courts of the States in certain classes of suits arising under the Constitution and laws of the United States.

It thus appears that the first Congress, in which were many who had been leading and influential members of the convention, and who were familiar with the discussions that preceded the adoption of the Constitution by the States and with the objections urged against it, did not understand that the original jurisdiction vested in the Supreme Court was necessarily exclusive. That jurisdiction included all cases affecting ambassadors, other public ministers and consuls, and those in which a State was a party. The evident purpose was to open and keep open the highest court of the nation for the determination, in the first instance, of suits involving a State or a diplomatic or commercial representative of a foreign government. So much was due to the rank and dignity of those for whom the provision was made; but to compel a State to resort to this one tribunal for the redress of all its grievances, or to deprive an ambassador, public minister or consul of the privilege of suing in any court he chose having jurisdiction of the parties and the subject matter of his action, would be, in many cases, to convert what was intended as a favor into a burden.

Acting on this construction of the Constitution, Congress took care to provide that no suit should be brought *against* an ambassador or other public minister except in the Supreme Court, but that he might sue in any court he chose that was open to him. As to consuls, the commercial representatives of foreign governments, the jurisdiction of the Supreme Court was made concurrent with the District Courts, and suits of a civil nature could be brought against them in either tribunal.

With respect to States, it was provided that the jurisdiction of the Supreme Court should be exclusive in all controversies of a civil nature where a State was a party, except between a State and its citizens, and except, also, between a State and citizens of other States or aliens, in which latter case its jurisdiction should be original but not exclusive. Thus the original jurisdiction of the Supreme Court was made concurrent with any other court to which jurisdiction might be given in suits between a State and citizens of other States or aliens. No jurisdiction was given in such cases to any other court of the United States, and the practical effect of the enactment was, therefore, to give the Supreme Court exclusive original jurisdiction in suits against a State begun without its consent, and to allow the State to sue for itself in any tribunal that could entertain its case. In this way States, ambassadors, and public ministers were protected from the compulsory process of any court other than one suited to their high positions, but were left free to seek redress for their own grievances in any court that had the requisite jurisdiction. No limits were set on their powers of choice in this particular. This, of course, did not prevent a State from allowing itself to be sued in its own courts or elsewhere in any way or to any extent it chose.

The Judiciary Act was passed on the 24th of September, 1789, and at the April Term, 1793, of the Circuit Court of the United States for the District of Pennsylvania, an indictment was found against Ravara, a consul from Genoa, for a misdemeanor in sending anonymous and threatening letters to the British minister and others with a view to extort money. Objection was made to the jurisdiction for the reason that the exclusive cognizance of the case belonged to the Supreme Court on account of the official character of the defendant. The court was held by Wilson and Iredell, Justices of the Supreme Court, and Peters, the District Judge. Mr. Justice Wilson, who had been a member of the convention that framed the Constitution, was of opinion "that although the Constitution vests in the Supreme Court an original jurisdiction, in cases like the present, it does not preclude the legislature from exercising the power of vesting a concurrent jurisdiction in such inferior

courts as might by law be established." Mr. Justice Iredell thought "that, for obvious reasons of public policy, the Constitution intended to vest an exclusive jurisdiction in the Supreme Court upon all questions relating to the public agents of foreign nations. Besides, the context of the judiciary article of the Constitution seems fairly to justify the interpretation that the word original means exclusive jurisdiction." The district judge agreed in opinion with Mr. Justice Wilson, and consequently, the jurisdiction was sustained. *United States* v. *Ravara*, 2 Dall. 297.

On the 18th of February, 1793, just before the indictment against Ravara in the Circuit Court, the case of *Chisholm* v. *Georgia*, 2 Dall. 419, was decided in the Supreme Court, holding that a State might be sued in that court by an individual citizen of another State. The judgment was concurred in by four of the five justices then composing the court, including Mr. Justice Wilson, but Mr. Justice Iredell dissented. This decision, as is well known, led to the adoption of the eleventh article of amendment to the Constitution, which provides that the judicial power of the United States shall not be construed to extend to a suit against a State by a citizen of another State, or by a citizen or subject of a foreign State.

It is a fact of some significance, in this connection, that although the decision in Chisholm's case attracted immediate attention and caused great irritation in some of the States, that in Ravara's case, which in effect held that the original jurisdiction of the Supreme Court was not necessarily exclusive, seems to have provoked no special comment. The efforts of the States before Congress assembled, and of Congress afterwards, were directed exclusively to obtaining "such amendments in the Constitution of the United States as will remove any clause or articles of the said Constitution which can be construed to imply or justify a decision that a State is compellable to answer in any suit by an individual or individuals in any court of the United States." Resolve of the Legislature of Mass. Sept. 27th, 1793.

In *Marbury* v. *Madison*, 1 Cranch, 137, decided in 1803, it was held that Congress had no power to give the Supreme

Court original jurisdiction in other cases than those described in the Constitution, and Chief Justice Marshall, in delivering the opinion, used language, on page 175, which might, perhaps, imply that such original jurisdiction as had been granted by the Constitution was exclusive; but this was not necessary to the determination of the cause, and the Chief Justice himself afterwards, in *Cohens* v. *Virginia,* 6 Wheat. 264, 399, referred to many expressions in that opinion as *dicta* in which (p. 401), "the court lays down a principle which is generally correct, in terms much broader than the decision, and not only much broader than the reasoning with which that decision is supported, but in some instances contradictory to its principle." In concluding that branch of the case, he said, "the general expressions in the case of *Marbury* v. *Madison* must be understood with the limitations which are given to them in this opinion; limitations which, in no degree, affect the decision of that case or the tenor of its reasoning."

In *Cohens* v. *Virginia,* the question was whether the Supreme Court had appellate jurisdiction for the review of the final judgment of the highest court of a State in a suit between a State and one of its own citizens arising under the laws of the United States, and the language of the opinion in that case is to be construed in connection with the general subject then under consideration. The same is true of *Osborn* v. *United States Bank,* 9 Wheat. 737, where the question was whether the Circuit Courts of the United States had jurisdiction of suits by and against the United States Bank. In *United States* v. *Ortega,* 11 Wheat. 467, the question was for the first time directly presented to this court whether our original jurisdiction was necessarily exclusive, but it was not decided, because the suit was found not to be one affecting a public minister. In *Davis* v. *Packard,* 7 Pet. 276, the Court of Errors of New York had decided that the character of consul did not exempt Davis, the plaintiff in error, from a suit in a State court; and in reversing a judgment to that effect this court said, speaking, in 1833, through Mr. Justice Thompson, all the other justices concurring, that, "as an abstract question, it is difficult to understand on what ground a State court can claim jurisdiction

of civil suits against foreign consuls. By the Constitution the judicial power of the United States extends to all cases affecting ambassadors, other public ministers, and consuls, &c. And the Judiciary Act of 1789 gives to the District Courts of the United States, *exclusively of the courts of the several States*, jurisdiction of all suits against consuls and vice-consuls, except for certain offences mentioned in the act." In *Cohens* v. *Virginia*, 6 Wheat. 397, Chief Justice Marshall said : " Foreign consuls frequently assert, in our prize courts, the claims of their fellow subjects. These suits are maintained by them as consuls. The appellate power of this court has frequently been exercised in such cases, and it has never been questioned. It would be extremely mischievous to withhold its exercise. Yet the consul is the party on the record."

Such having been the action of the courts of the United States in construing this provision of the Constitution, the question of the exclusiveness of the jurisdiction in cases affecting consuls was, in 1838, directly presented to Chief Justice Taney on the circuit in the case of *Gittings* v. *Crawford*, Taney's Decisions, 1, and, after reviewing all the cases in an elaborate opinion, he says, p. 9 : " The true rule in this case is, I think, the rule which is constantly applied to ordinary acts of legislation in which the grant of jurisdiction over a certain subject matter to one court does not, of itself, imply that that jurisdiction is to be exclusive. In the clause in question there is nothing but mere affirmative words of grant, and none that import a design to exclude the subordinate jurisdiction of other courts of the United States on the same subject matter."

Afterwards, Mr. Justice Nelson, in the case of *St. Luke's Hospital* v. *Barclay*, 3 Blatch. 259, 265, in 1855, and in *Graham* v. *Stucken*, 4 Blatch. 50, in 1857, decided the same question in the same way. In the course of his opinion in the last case, p. 52, he uses this language, pertinent to the particular phase of the question which we are now considering : " Again, the grant of original jurisdiction to the Supreme Court is the same in the cases  .  .  .  ' in which a State shall be a party,' as in the case of a consul. Those cases are controversies, 1, between two or more States ; 2, between a State and citizens of another

State; 3, between a State and foreign States; and 4, between a State and citizens or subjects of foreign States, that is, aliens. Now, if the grant of original jurisdiction be exclusive in the Supreme Court in the case of a consul, it is equally exclusive in the four cases above enumerated; for the grant is in the same clause and in the same terms. And yet in the 13th section of the Judiciary Act, already referred to, it is provided that the Supreme Court shall have exclusive jurisdiction, &c., where a State is a party, &c., except between a State and citizens of other States, or aliens, in which latter case it shall have original but not exclusive jurisdiction. According to the argument, the whole of the exception would be unconstitutional, as the cases mentioned should have been vested exclusively in the Supreme Court." Following these decisions, we have held at the present term, in *Börs* v. *Preston*, *ante*, 252, that consuls may be sued in the Circuit Courts of the United States in cases where the requisite citizenship exists.

In view of the practical construction put on this provision of the Constitution by Congress at the very moment of the organization of the government, and of the significant fact that from 1789 until now no court of the United States has ever in its actual adjudications determined to the contrary, we are unable to say that it is not within the power of Congress to grant to the inferior courts of the United States jurisdiction in cases where the Supreme Court has been vested by the Constitution with original jurisdiction. It rests with the legislative department of the government to say to what extent such grants shall be made, and it may safely be assumed that nothing will ever be done to encroach upon the high privileges of those for whose protection the constitutional provision was intended. At any rate, we are unwilling to say that the power to make the grant does not exist.

It remains to consider whether jurisdiction has been given to the Circuit Courts of the United States in cases of this kind. As has been seen, it was not given by the Judiciary Act of 1789, and it did not exist in 1873, when the case of *Wisconsin* v. *Duluth*, 2 Dill. 406, was decided by Mr. Justice Miller on the circuit. But the act of March 3d, 1875, ch. 137, 18

Stat. 470, "to determine the jurisdiction of Circuit Courts of the United States, and to regulate the removal of causes from the State courts, and for other purposes," does, in express terms, provide, "that the Circuit Courts of the United States shall have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law, or in equity, . . . arising under the Constitution or laws of the United States;"and also that suits of the same nature begun in a State court may be removed to the Circuit Courts. And here it is to be remarked, that there is nothing in this which manifests an intention to interfere with the exclusive original jurisdiction of the Supreme Court as established by the act of 1789, and continued by section 687 of the Revised Statutes. The only question we have to consider is, therefore, whether suits cognizable in the courts of the United States on account of the nature of the controversy, and which need not be brought originally in the Supreme Court, may now be brought in or removed to the Circuit Courts without regard to the character of the parties. All admit that the act does give the requisite jurisdiction in suits where a State is not a party, so that the real question is, whether the Constitution exempts the States from its operation.

The same exemption was claimed in *Cohens* v. *Virginia*, 6 Wheat. 294, to show that the appellate jurisdiction of this court did not extend to the review of the judgments of a State court in a suit by a State against one of its citizens; but Chief Justice Marshall said, "the argument would have great force if urged to prove that this court could not establish the demand of a citizen upon his State, but is not entitled to the same force, when urged to prove that this court cannot inquire whether the Constitution or laws of the United States protect a citizen from a prosecution instituted against him by a State. . . . It may be true that the partiality of the State tribunals, in ordinary controversies between a State and its citizens, was not apprehended, and, therefore, the judicial power of the Union was not extended to such cases; but this was not the sole nor the greatest object for which this department was created. A more important, a much more interesting, object, was the

preservation of the Constitution and laws of the United States, so far as they can be preserved by judicial authority; and, therefore, the jurisdiction of the courts of the Union was expressly extended to all cases arising under the Constitution and those laws. If the Constitution or laws may be violated by proceedings instituted by a State against its own citizens, and if that violation may be such as essentially to affect the Constitution and the laws, such as to arrest the progress of government in its constitutional course, why should these cases be excepted from that provision which expressly extends the judicial power of the Union to *all* cases arising under the Constitution and laws? After bestow/rig on this subject the most attentive consideration, the co ℧ can perceive no reason, founded on the character of *the* parties, for introducing an exception which the Constitutio has not made; and we think the judicial power, as originally given, extends to all cases arising under the Constitution or a law of the United States, whoever may be the parties," pp. 391–2.

The language of the act of 1875 in this particular is identical with that of the Constitution, and the evident purpose of Congress was to make the original jurisdiction of the Circuit Courts co-extensive with the judicial power in all cases where the Supreme Court had not already been invested by law with exclusive cognizance. To quote again from Chief Justice Marshall, in *Cohens* v. *Virginia,* p. 379, "the jurisdiction of the court, then, being extended by the letter of the Constitution to all cases arising under it, or under the laws of the United States, it follows, that those who would withdraw any case of this kind from that jurisdiction must sustain the exemption they claim, on the spirit and true meaning of the Constitution, which spirit and true meaning must be so apparent as to overrule the words which its framers have employed." This rule is equally applicable to the statute we have now under consideration. The judicial power of the United States extends to *all* cases arising under the Constitution and laws, and the act of 1875 commits the exercise of that power to the Circuit Courts. It rests, therefore, on those who would withdraw any case within that power from the cognizance of the Circuit

Courts to sustain their exception "on the spirit and true meaning of the" act, "which spirit and true meaning must be so apparent as to overrule the words its framers have employed." To the extent that the words conflict with other laws giving exclusive original jurisdiction to the Supreme Court this has been done, but no more. The judicial power of the United States exists under the Constitution, and Congress alone is authorized to distribute that power among courts.

We conclude, therefore, that the cases were removable under the act of March 3d, 1875.

*The order to remand in each case is reversed, and the Circuit Court directed to entertain the cases as properly removed from the State court and proceed accordingly.*