Edna VAN DER SCHELLING

v.

U. S. NEWS & WORLD REPORT, INC.

Civ. A. No. 29692.

United States District Court
E. D. Pennsylvania.

Feb. 4, 1963.

Harry Lore, of Dorfman, Pechner, Sacks & Dorfman, Philadelphia, Pa., for plaintiff.

Philip H. Strubing, of Pepper, Hamilton & Scheetz, Philadelphia, Pa., James H. McGlothin, of Covington & Burling, Washington, D. C., of counsel, for defendant.

JOSEPH S. LORD, III, District Judge.

I am most grateful to both counsel in this case for their exceptionally able, thoughtful and imaginative briefs.

Federal jurisdiction in this libel action is invoked solely on the basis of diversity of citizenship: 28 U.S.C.A. § 1332. Defendant has moved to dismiss the complaint, arguing that, while plaintiff is a citizen of the United States, she is not a citizen of any state therein and, therefore, since this is not a suit between "citizens of different States" [28 U.S.C.A. § 1332(a) (1)], diversity jurisdiction does not exist. Plaintiff, on the other hand, contends that federal jurisdiction exists because she is a "subject" of a foreign state within the meaning of 28 U.S.C.A. § 1332(a) (2), which provides:

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs, and is between— * * *

"citizens of a State, and foreign states or citizens or subjects thereof."

The plaintiff is concededly a citizen of the United States (complaint, para. 1, p. 4 [1]). Since 1950 she has lived and worked in Mexico, and for the past eleven years she has been a permanent and continuous resident of the Republic of

1. Page references are to plaintiff's deposition under oath.

Mexico (pp. 2–3). Plaintiff owns no property in the United States, having sold whatever land she had owned in California in 1961 (pp. 7–8, 10, 34). She last applied for a passport in 1951 or 1952 and has not since had it renewed (p. 4). Plaintiff has no present ties whatsoever with the United States. Her status in Mexico, according to an unrebutted affidavit given by a Mexican lawyer .and filed by defendant, is that of "inmigrado." That status gives plaintiff the "right of definitive residence" in Mexico, the right to stay there indefinitely, to hold any job, to change jobs or not to work at all. Defendant is a Delaware corporation with its principal place of business in the District of Columbia.

In Pemberton v. Colonna, 290 F.2d 220 (C.A.3, 1961), the facts were identical to those of this case. The entire per Curiam opinion reads:

"In this case the plaintiff seeks to maintain a suit in federal court on the basis of diversity of citizenship, 28 U.S.C. § 1332. In the district court there was controversy upon the question whether plaintiff had established a new domicile in Mexico. The court found that she had. We are not reviewing this phase of the case. Assuming that .she has established a domicile in Mexico she still is not entitled to maintain an action in federal court. It is admitted she has not become a citizen of Mexico and that she is living there under what is called a 'tourists' card.' A citizen of the United States is a citizen of the .state in which he is domiciled. That ·is clear. But a citizen abroad is not a citizen of the country where ·he makes his home. To do that he must renounce his United States citizenship and acquire citizenship in the foreign country. We think that section (a) (2) 'citizens of a .State, and foreign states or citizens or subjects thereof * * *' means what it says. The plaintiff even if .no longer a citizen of Pennsylvania

is a citizen of the United States and not a *citizen* of Mexico under the admitted facts." (Emphasis added.)

It may be that Pemberton impliedly decides the issue before me. However, I have examined the briefs in that case . and the sole question presented by appellant was:

"I. Plaintiff as a domiciliary of the Country of Mexico is a 'citizen' of a foreign state within the meaning of Section 1332(a) (2) of 28 U.S.C.A."

Because Pemberton was decided per Curiam and the issue of whether plaintiff was a "subject" of Mexico was apparently not presented to the Court of Appeals, and because I conceive this to be an important question of federal jurisdiction, I feel it appropriate to set out my own views.

The precise question is the meaning of the word "subjects" in § 1332(a) (2) of Title 28 U.S.C.A. Is it to be equated with "citizens" or does it establish a different and additional class of persons who have federal access?

In Nagle v. Loi Hoa, 275 U.S. 475, 48 S.Ct. 160, 72 L.Ed. 381 (1928), speaking of the word "subject" as used in the Chinese Exclusion Act, the Court said, at page 477, 48 S.Ct. at pages 160, 161, 72 L.Ed. 381:

"The sole question presented is .whether the word 'subject' as used in § 6 is to be taken as including only those persons who by birth or naturalization owe permanent allegiance to the government issuing the certificate, or as embracing also those who, being domiciled within the territorial limits of that government, owe it for that reason obedience and temporary allegiance.

"The word may be used in either sense. * * *"

In 2 Kent's Commentaries (14th Ed.) at page 75, it is said:

"* * * So, an American citizen may obtain a foreign domicile, which will impress upon him a national character for commercial pur-

poses, in like manner as if he were a subject of the government under which he resided; and yet without losing on that account his original character, or ceasing to be bound by the allegiance due to the country of his birth. * * * "

Thus, in The Pizzaro, 15 U.S. (2 Wheat.) 227, 4 L.Ed. 226 (1817), the claimant of a Spanish vessel seized as a prize had been born in Great Britain. However, he was a domiciliary of Spain and asserted certain favorable rights given to Spanish subjects under a Treaty of 1795 between Spain and the United States.. No question of federal jurisdiction was involved. Justice Story said, at page 246, 4 L.Ed. 226:

" * * * Indeed, in the language of the law of nations, which is always to be consulted in the interpretation of treaties, a person domiciled in a country, and enjoying the protection of its sovereign, is deemed a subject of that country. He owes allegiance to the country, while he resides in it; temporary, indeed, if he has not, by birth or naturalization, contracted a permanent allegiance; but so fixed that, as to all other nations, he follows the character of that country, in war as well as in peace. * * * "

■ Thus, it is undoubtedly true that domicile may impress one with the characteristics of a subject of the place of domicile for commercial purposes. Is this different from the sense of the word "subject" as used in Article III, Section 2 of the Constitution? I think it is.

■ That Article authorizes federal jurisdiction in controversies "between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." The Judicial Code of 1789 and the present § 1332 are Congressional implements of this Article. Thus, to determine the meaning of § 1332 we must first determine the meaning of the Constitution. Some examination of the reason for making federal jurisdiction available to citizens or subjects of a foreign state will be helpful.

In "The Federalist", No. 80, it is said (pp. 588–589):

" * * * The fourth point rests on this plain proposition, that the peace of the WHOLE, ought not to be left at the disposal of a PART. The union will undoubtedly be answerable to foreign powers for the conduct of its members. And the responsibility for an injury, ought ever to be accompanied with the faculty of preventing it. As the denial or perversion of justice by the sentences of courts, is with reason classed among the just causes of war, it will follow, that the federal judiciary ought to have cognizance of all causes in which *the citizens* of other countries are concerned. This is not less essential to the preservation of the public faith, than to the security of the public tranquillity. A distinction may perhaps be imagined, between cases arising upon treaties and the laws of nations, and those which may stand merely on the footing of the municipal law. The former kind may be supposed proper for the federal jurisdiction, the latter for that of the states. But it is at least problematical, whether an unjust sentence against *a foreigner,* where the subject of controversy was wholly relative to the *lex loci,* would not, if unredressed, be an aggression upon *his sovereign,* as well as one which violated the· stipulations of a treaty, or the general law of nations. And a still greater objection to the distinction would result from the immense difficulty, if not impossibility, of a practical discrimination between the cases of one complexion and those of the other. So great a proportion of the controversies in which *foreigners* are parties, involve national questions, that it is by far most safe, and most expedient, to refer

all those in which they are concerned to the national tribunals. * * * " (Emphasis added.)

In the debates in Pennsylvania concerning the adoption of the Constitution, James Wilson said (2 Elliot's Debates 492–493):

" * * * It was thought proper to give *the citizens* of foreign states full opportunity of obtaining justice in the general courts, and this they have by its appellate jurisdiction; therefore, in order to restore credit with those foreign states, that part of the article is necessary. I believe the alteration that will take place in their minds when they learn the operation of this clause will be a great and important advantage to our country; nor is it any thing but justice: they ought to have the same security against the state laws that may be made, that the citizens have; because regulations ought to be equally just in the one case as in the other. Further, it is necessary in order to preserve peace with foreign nations. Let us suppose the case, that a wicked law is made in some one of the states, enabling a debtor to pay his creditor with the fourth, fifth, or sixth part of the real value of the debt, and this creditor, *a foreigner,* complains to *his prince or sovereign,* of the injustice that has been done him. What can that prince or sovereign do? Bound by inclination, as well as duty, to redress the wrong *his subject* sustains from the hand of perfidy, he cannot apply to the particular guilty state, because he knows that, by the Articles of Confederation, it is declared that no state shall enter into treaties. He must therefore apply to the United States; the United States must be accountable. '*My subject* has received a flagrant injury: do me justice, or I will do myself justice.' If the United States are answerable for the injury, ought they not to possess the means of compelling the faulty state to repair it? They ought; and this is what is done here. For now, if complaint is made in consequence of such injustice, Congress can answer, 'Why did not *your subject* apply to the General Court, where the unequal and partial laws of a particular state would have had no force?' * * * " (Emphasis added.)

Two things are immediately apparent. First, both Hamilton and Wilson, in discussing Article III, Section 2, refer to citizens, subjects and foreigners interchangeably. These references, it seems to me, are an equation, perhaps unconscious, in the minds of the framers that "citizen" and "subject" mean the same thing. Second, if the main purpose was to provide a national forum with the object of preserving the peace, it seems hardly likely that a foreign sovereign or government would become martially exorcised over a wrong to a citizen of the United States who can go into his native courts as a native.[2]

The legislators of 1789 who enacted the Judiciary Act of 1789 apparently felt that Article III, Section 2, was not concerned with Americans abroad, for that first implementing Act provided federal access where the suit was between a citizen of the United States and *aliens,* a designation that persisted until the Act was amended in 1875. There is no reason to suppose that the first Congress deliberately failed to exercise a power given by the Constitution, and the inference is, I think, that those who stood close to the framing of the Constitution, both in point of time and association,[3]

[2.] The fact that a non-inhabitant of a state might have to sue a resident in his local state court was a concern that gave rise to the diversity provisions of Article III, Section 2, respecting citizens of different states (see "The Federalist", No. 80, p. 589), but would hardly be of concern to a foreign power, whether republican or sovereign in form.

[3.] Of the men who attended the Constitutional Convention, ten were senators and

intended to exhaust the grant of federal jurisdiction. The necessary concomitant is that by using "aliens", they embraced "citizens or subjects" as constitutionally used in Article III. The necessary conclusion is, then, that the Constitution did not cover American citizens domiciled abroad, for these are not aliens: 2 Am.Jur., Aliens, § 2; Hammerstein v. Lyne, 200 F. 165 (W.D.Mo.1912); Low Wah Suey v. Backus, 225 U.S. 460, 32 S.Ct. 734, 56 L.Ed. 1165 (1912); 2 Kent's Comm. (12th Ed.) 51.

Viewed against the background of history and the context of the times, it is not surprising that the men who drafted the Constitution equated "citizen" and "subject". Until the Colonies had successfully won their freedom from England, their inhabitants were *subjects* of the King. With the birth of the United States, the sovereignty that had previously been that of one man,—the King,—was transferred to the collective body of the people. Those who had been subjects of the King were now *citizens* of the State.

In United States v. Wong Kim Ark, 169 U.S. 649 at pages 663–664, 18 S.Ct. 456, at pages 462–463, 42 L.Ed. 890 (1898), the Court said:

> " * * * The Supreme Court of North Carolina, speaking by Mr. Justice Gaston, said: 'Before our Revolution, all free persons born within the dominions of the King of Great Britain, whatever their color or complexion, were native-born British subjects; those born out of his allegiance were aliens. * * * Upon the Revolution, no other change took place in the law of North Carolina, than was consequent upon the transition from a colony dependent on an European King to a free and sovereign State; * * * British subjects in North Carolina became North Carolina freemen; * * * and all free persons born within the State are born citizens of the State. * * * The term 'citizen,' as understood in our law, is precisely analogous to the term 'subject' in the common law, and the change of phrase has entirely resulted from the change of government. The sovereignty has been transferred from one man to the collective body of the people; and he who before was a 'subject of the King' is now 'a citizen of the State.' State v. Manuel, (1838) [20 N.C. 144] 4 Dev. & [Bat.] 20, 24–26. * * * "

The same case (page 665, 18 S.Ct. page 463, 42 L.Ed. 890) quotes from Kent's Comm.:

> " * * * And he elsewhere says: 'And if, at common law, all human beings born within the ligeance of the King, and under the King's obedience, were natural-born subjects, and not aliens, I do not perceive why this doctrine does not apply to these United States, in all cases in which there is no express constitutional or statute declaration to the contrary.' * * * 'Subject and citizen are, in a degree, convertible terms as applied to natives; and though the term *citizen* seems to be appropriate to republican freemen, yet we are, equally with the inhabitants of all other countries, *subjects,* for we are equally bound by allegiance and subjection to the government and law of the land.' 2 Kent, Com. 258, note. * * * "

(Emphasis, the author's.)

---

nine were representatives in the first Congress of 1789. Of the Congressional Committee which drafted the Judiciary Act of 1789 five of the eight members had served in the Convention of 1787: see Warren, "History of the Federal Judiciary Act of 1789", 37 Harv.L.R. 49, 57 (1923). In Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 297, 8 S.Ct. 1370, 1377, 1378, 32 L.Ed. 239 (1888), the

Court noted that the Judiciary Act " * * * was passed by the First Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, and is contemporaneous and weighty evidence of its true meaning." See also Ames v. Kansas, 111 U.S. 449, 464, 4 S.Ct. 437, 28 L. Ed. 482 (1883).

The framers of the Constitution were undoubtedly keenly aware of the fact that they had lately been subjects and that in other lands men still remained subjects of a sovereign and not citizens of a state. Hence, if federal jurisdiction had been couched solely in terms of "citizenship," there may have resulted an arbitrary denial of federal access to many foreigners only because of the nature of the government under which they happened to live. It was only by the inclusion of "subjects" that all aliens, whether they owed allegiance to a sovereign monarch or were citizens of a democracy, could sue or be sued in federal courts.

The view that "citizens" and "subjects" are exact equivalents has been questioned but once that I can find.

In Wildes et al. v. Parker et al., 29 Fed.Cas. Case No. 17,652, page 1224 (Mass.1839), the defendants were citizens of Massachusetts. One of the plaintiffs was a native of Massachusetts, but in 1834 had gone to England, where he had remained, having gone into partnership with the other plaintiffs. He had never been naturalized in Great Britain, but was undoubtedly domiciled there. Defendants questioned federal jurisdiction. Story, as Circuit Judge, said, at page 1226:

"* * * The constitution of the United States declares, among other things, that the judicial power shall extend to controversies 'between a state or the citizens thereof, and foreign states, citizens, or subjects.' The judiciary act of 1789, c. 20, § 11 [1 Stat. 78], declares, that the circuit courts shall have jurisdiction of suits of a civil nature, where 'an alien is a party.' The main question, therefore, in this case, is, whether by 'alien,' in the act of 1789, and by 'foreign citizens or subjects,' in the constitution, is meant such persons as are, either by nativity or by naturalization, aliens, or foreign citizens or subjects, or whether it applies to those who are temporarily and at the time aliens, or foreign subjects for commercial purposes. It would be strange, if, in respect to all commercial transactions, an American citizen, domiciled in a foreign country, is to be treated as a foreign merchant and foreign subject, and yet if he sues on a commercial transaction, arising during his domicile abroad, he is to be deemed an American citizen. That would be to say, that he was a foreigner, as to all purposes, except of suits in the courts of the United States. Now, this is the point, on which my doubts hinge; and I am, therefore, desirous of having the opinion of the supreme court thereon. * * *"

Enigmatically enough, we are told (see 29 Fed.Cas. p. 1226, note) that the case was certified to the Supreme Court of the United States, the justices were divided and the opinions were never reported. We are thus left unenlightened as to what eventually happened to Justice Story's doubts but, in any event, they were never expressed again either by him or by any other court. Indeed, Story's doubts appear to have been abandoned, for in his "Commentaries on the Constitution of the United States" (5th Ed., 1891) he says, at page 499:

"* * * The inquiry may here be made, who are to be deemed aliens entitled to sue in the courts of the United States? The general answer is, any person who is not a citizen of the United States. * * *"

In Carlisle v. United States, 83 U.S. (16 Wall.) 147 at page 154, 21 L.Ed. 426 (1873), Mr. Justice Field said:

"* * * The citizen or subject owes an absolute and permanent allegiance to his government or sovereign; or at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign. * * *"

In Minor v. Happersett, 88 U.S. (21 Wall.) 162, 22 L.Ed. 627 (1875), the Court pointed out that a citizen is a

member of a political community. The Court then said, at page 166, 22 L.Ed. 627:

> " * * * For convenience it has been found necessary to give a name to this membership. The object is to designate by a title the person and the relation he bears to the nation. For this purpose the words 'subject,' 'inhabitant,' and 'citizen' have been used, and the choice between them is sometimes made to depend upon the form of the government. Citizen is now more commonly employed, however, and as it has been considered better suited to the description of one living under a republican government, it was adopted by nearly all of the States upon their separation from Great Britain, and was afterwards adopted in the Articles of Confederation and in the Constitution of the United States. When used in this sense it is understood as conveying the idea of membership of a nation, and nothing more. * * * "

In Stuart v. City of Easton, 156 U.S. 46, 15 S.Ct. 268, 39 L.Ed. 341 (1895), plaintiff was described as a "citizen of London, England," and defendants as Pennsylvania corporations. The Court said that federal jurisdiction " * * * confessedly depended on the *alienage* of plaintiff in error * * * ." (Emphasis added.) It seems to me significant that alienage was continued as a jurisdictional prerequisite even after the Judicial Code was amended in 1875 to substitute "citizens or subjects" for "aliens."

*Stuart* was the basis for the holding in Bishop v. Averill et ux., 76 F. 386 (D.Wash.1896). There, defendants sought to remove an action commenced in the state court. Plaintiff was a citizen of Montana. Defendants had been citizens of Montana but 15 months previously had left to become permanently domiciled in Canada, where they intended to become naturalized. In rejecting jurisdiction, the court said, at page 387, referring to *Stuart*:

> " * * * It affirmatively appears that the controversy in this case is not between citizens of different states of our own nation, and to sustain the claim of the defendants that this court has jurisdiction we must find as a fact that the defendants are citizens or subjects of a foreign state, or aliens, as I understand the supreme court in the decision above referred to. * * *
>
> "On the evidence, also, I must hold that the court does not have jurisdiction. The defendants have, by removal from Montana, lost their citizenship in that state, and they have become residents of a foreign country, but they have not acquired the rights nor assumed the obligations of a new citizenship. * * * "

*Bishop* is apparently the only case precisely on the point before me. However, a good many cases have impliedly squinted in the same direction, most of which proceed on the premise that a person can be a citizen of the United States, or a citizen or subject of a foreign state, or neither, but cannot be both at the same time:[4] Pemberton v. Colonna, supra, where, as here, plaintiff was an American citizen domiciled in Mexico; Hammerstein v. Lyne, 200 F. 165 (W.D. Mo.1912), supra, where the defendant was an American citizen domiciled in England; Stein v. Fleischmann Co., 237 F. 679 (S.D.N.Y.1916), where the plaintiff was a naturalized American citizen residing in his native Austria; Wittmeyer Trucking Co. v. Fess Transport Ltd., 191 F.Supp. 802 (W.D.N.Y.1961), where one of the defendants was an American citizen residing in Canada; and McClanahan v. Galloway, 127 F.Supp. 929 (N.D. Cal.1955), where the defendants were

---

4. But compare Murray v. Schooner Charming Betsy, 2 Cranch. 64, 2 L.Ed. 64 (1804), where a United States citizen, the owner of the vessel involved, had taken an oath of allegiance to Denmark. The Court held the ship was the property of a "Danish burgher," but expressly refused to decide whether that owner had lost his United States citizenship. Thus, apparently, the Court did not decide the problem of dual nationality.

American citizens who had lived in the Republic of Colombia for thirty years. See also Blair Holdings Corporation v. Rubinstein, 133 F.Supp. 496 (S.D.N.Y. 1955) (stateless aliens are not within the jurisdictional statute); Medvedieff v. Cities Service Oil Co., 35 F.Supp. 999 (S.D.N.Y.1940) (same); Shoemaker v. Malaxa, 241 F.2d 129 (2d Cir., 1957) (same).

It would appear that, unfortunately, if plaintiff's present federal action is dismissed any state action will be barred by the statute of limitations. If that result should follow, I regret that I am its instrument. My determination of the law, however, can be guided only by what I think it is and not by external motives. " * * * But motives of commiseration, from whatever source they flow, must not mingle in the administration of justice. Judges, in the exercise of their functions, have frequent occasion to exclaim, 'durum valde durum, sed sic lex est.' * * * ": Penhallow et al. v. Doane's, Adm'rs, 3 U.S. (Dall.) 54, 1 L.Ed. 507 (1795).

In light of my conclusion, defendant's motion to dismiss for want of jurisdiction must be granted.