## HARVEY and another *v.* COMMONWEALTH OF VIRGINIA.

*(Circuit Court, E. D. Virginia.* May 12, 1884.)

1. **CONSTITUTIONAL LAW—STATE STATUTE MAKING COUPONS ON BONDS RECEIVABLE FOR TAXES—SUBSEQUENT STATUTE.**

   Where a state contracts, in terms, that the coupons attached to its bonds shall be receivable in payment of "all debts, dues, and demands due the state," the contract embraces license taxes; and if, in a subsequent law, it prescribes such conditions precedent to the issuing of licenses as to enforce the payment of license taxes in money, and to preclude their payment in coupons, she violates that clause of the tenth section of the first article of the constitution of the United States which forbids any state from passing any law impairing the obligation of contracts.

2. **SAME—RIGHT OF CITIZEN TO SUE STATE—JURISDICTION OF CIRCUIT COURT.**

   *Quære,* whether the first clause of the second section of the third article of the United States constitution, which extends the judicial power of the United States to *all* cases in law and equity arising under the constitution and laws of the United States, as this clause is put in force by the first section of the judiciary act of congress of March 3, 1875, giving jurisdiction of all such cases to the circuit courts of the United States, authorizes a citizen to sue his own state, in such a case, in a federal court.

3. **SAME—CONFORMITY TO PRACTICE IN STATE COURT—REPEAL BY STATE OF SPECIAL ACT AUTHORIZING SUIT.**

   Even though (under section 914 of the Revised Statutes, requiring proceedings at law in courts of the United States to be conformed to proceedings in similar cases in state courts) an anomalous proceeding at law may be brought

in a federal court in the manner in which it is authorized by special act to be brought in a state court, yet if the state has repealed such special act, then the special proceeding is no longer maintainable in the federal court, and must be dismissed if brought.

4. SAME — UNCONSTITUTIONAL CLAUSES IN STATUTE — EFFECT OF REPEALING CLAUSE.

If any act of legislation, which is unconstitutional in many of its provisions, repeals all acts and parts of acts inconsistent with such provisions, the repealing clause is effective; although such provisions be null and void.

Petition.

*Wm. L. Royall,* for petitioners.

*Frank S. Blair,* Atty. Gen., and *Wyndham Meredith,* for the State of Virginia.

HUGHES, J. The petitioners are wholesale grocers in the city of Richmond. Their petition sets out, by reference and recital, the following facts:

By a recent act of the assembly of Virginia, that of March 15, 1884, relating to assessments and licenses, petitioners are required to pay to the state a license tax of $504, for the privilege of carrying on their business for the year beginning on the first day of the present month. In pursuance of this law, petitioners paid to the collector of the city of Richmond the aforementioned sum of money, and duly received from the commissioner of revenue in Richmond a license to carry on their business. Under an act of assembly, commonly called the funding act, approved on the thirtieth of March, 1871, the state issued bonds, with coupons attached, which latter bear on their face the declaration of the state, that they shall be receivable, after they mature, for "all taxes, debts, dues, and demands due the state." See acts of Assembly of 1870 and 1871, *c.* 282, § 2, p. 379.

Petitioners claim that this was a contract which entitled them to pay their license tax of $504 in coupons. They aver that they endeavored to obtain the benefit of this contract in the manner prescribed by the third section of another act of assembly of Virginia, viz., that relating to frauds upon the commonwealth, etc., approved January 14, 1882. See acts of Assembly of 1881–82, *c.* 7, § 3, p. 10. That is to say, they paid the $504 in money to the collector of taxes for Richmond, and at the same time tendered to that officer an equivalent amount of past-due coupons, coupling this tender with the request that he would take possession of the coupons and deliver the same to the judge of the hustings court of Richmond for identification and verification by a jury, as provided by the third section of the said last-named act, with a view to their being received by the state in payment of petitioners' license tax, and to the return to them of the money ($504) which they had paid for their license. Petitioners aver that the collector refused to receive the coupons thus tendered, for this or any other purpose, and also refused to give petitioners a certificate in writing of their tender, as required by the third section of the last-named act; justifying his refusal by the terms of section 112 of the aforementioned act of assembly of Virginia, relating to the assessment of taxes and prescribing the mode of applying for licenses, approved March 15, 1884, which forbids collectors from receiving aught but gold, silver, United States treasury notes, or United States national bank-notes for license taxes, in any case.

Petitioners, therefore, come into this court, and complain that the act of assembly of Virginia last named is repugnant to the tenth section of the first article of the constitution of the United States, which declares, among other things, that "no state shall pass any law impairing the obligation of contracts," and is therefore unconstitutional, null, and void; and that by the

conduct of the collector of Richmond, above described, they have been deprived of a right thus secured to them by the constitution of the United States, to-wit, their right to pay the license tax aforesaid due the state of Virginia in coupons of the state. They accordingly ask the intervention of this court, and pray that it will grant them the remedy furnished to tax-payers who wish to pay their taxes in coupons by the aforesaid act of assembly of the fourteenth of January, 1882, by summoning the state before it, and impaneing a jury to identify and verify as genuine the coupons which they tendered to the collector of Richmond; and that this court, when such genuineness is shown, shall certify the fact to the proper officer of the state, and require the acceptance of the coupons in payment of the said tax and the return of the $504 of money which they have paid to the collector.

Upon motion, this court, by an order of the sixth instant, directed a rule to issue against the state, returnable to-day, reserving all questions of jurisdiction and the state now appears in the persons of the attorney general and of special counsel assigned by law for the purpose

On the merits of the case, I do not think there ought to be any difference of opinion. Any pecuniary charge imposed by the government, or the privilege of residence, or of holding property, or of exercising a calling, or engaging in a business, within its jurisdiction, is a tax. No refinements in lexicography, nor hypercriticisms upon the purport of words or phrases, can make such a charge anything else but a tax. There are taxes *per capita* levied upon persons exercising the privilege of residence in a state. There are taxes *ad valorem* levied upon persons exercising the privilege of holding property in the state. There are license taxes levied upon persons exercising the privilege of carrying on the business of merchants, or manufacturers, or other callings. They are all essentially the same in their fundamental nature; they are a charge imposed by the state for the exercise of privileges, as a compensation to herself for the protection which she affords by her laws alike to persons, to property, and to honest occupation. It is useless to say that such a charge is only a tax, when levied for the purpose of revenue; for there are such things as prohibitory taxes, the object of which is the opposite of revenue, which are taxes nevertheless. It is unavailing to refine upon such a subject. It is offensive, if not insulting, to the common sense of every candid citizen to pretend that the charge which the state may see fit to impose on merchants for the privilege of carrying on their business is anything else than the commonplace thing which practical men call a tax. The right of residence, of holding property, of conducting a business, may be a natural right, but the enjoyment of it under the protection of law is a privilege granted by the state, and therefore, for short, I have called it a privilege. Nor is there any essential difference between a tax *per capita*, levied for the privilege of residence, a tax *ad valorem*, levied for the privilege of holding property, and a license tax, levied for the privilege of conducting a particular calling. And therefore, when a legislature, by statute, singles out the privilege of carrying on trades, professions, and occupations, as has been done in the act of March 15, 1884, and requires a tax to be paid for

that privilege, and, instead of allowing it to be paid, as the state has pledged her faith that all taxes may be paid, viz., with coupons, forbids such payment by the most positive and stringent prohibitions, and absolutely requires its payment exclusively in money, the evasion of the state's obligation is manifest, the repudiation of its compact with the tax-payer tendering coupons is palpable, and the statute is unconstitutional so far as it prevents the payment of license taxes in verified coupons.

How can there be a rational doubt that the petitioners in this case had a right to pay their license tax in coupons after they had been identified and verified in the manner defined by law? They have been denied that unquestionable right; and therefore, on the merits alone, this case is a plain one for relief. The difficulty is the always important one in federal practice of jurisdiction. By the proceeding resorted to in the present case the state is summoned, in her sovereign character, before a federal court to answer a petition, on a week's notice. She appears in the persons of her law officers. It matters not how obviously just the prayer of the petitioners may be; that cannot make good the jurisdiction; for the meritorious character of a demand can never cure defects in procedure if that be essentially faulty. The question, therefore, is whether this court has power to administer relief to these petitioners *in this proceeding.* It will be seen from what follows that this is a difficult question, and involves a necessary, and, I fear, a somewhat tedious, review of the law of jurisdiction as applicable to the federal courts.

The remedy by summary petition, commencing originally with a rule *nisi,* is exceptional in the practice of the federal courts as an original proceeding, and is anomalous in all systems of judicature. The practice is more questionable when sovereign states are the parties defendant. In general, a sovereign state cannot be sued except in a manner and a forum consented to and chosen by itself. See the opinion of Lord SOMERS in the great case of *The Banker's Case,* 5 Mod. Rep. 29-62. If there be an exception to this general rule it is found in the terms of the second section of the third article of the constitution of the United States, which declares that "the judicial power of the United States shall extend to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties," etc. This grant is without limitation, in terms, as to parties to such suits, and does not, in terms, except suits brought against the sovereign states of this Union. That the states are contemplated by it is inferred from the fact that this section is to be construed in connection with the clause of the constitution before referred to, which forbids a state to pass any law impairing the obligation of contracts. As illustrating the full purport of this grant of jurisdiction in respect to states, it may be mentioned that, further on in the same section of the constitution, jurisdiction is given of controversies between a state and citizens of another state, and that in pursuance of this latter

grant the supreme court of the United States, in the case of *Chisholm* v. *Georgia*, 2 Dall. 419, held that a suit brought by a citizen of South Carolina against the state of Georgia had been properly brought in the supreme court of the United States. This decision led to a repeal of the grant by the speedy adoption of the eleventh amendment of the constitution, which declares that the federal courts shall not entertain any suit brought against any state "by citizens of another state, or by citizens or subjects of any foreign state." This amendment would seem to have a strong bearing on the question whether a state may be sued in a federal court by one of its own citizens. The first clause of the jurisdictional section of the constitution had left that right of the citizen to inference; and if that inference had not been legitimate it must be supposed that the eleventh amendment would have been made to embrace a denial of the right of a citizen to sue his own state in the federal courts, as well as his right to sue other states of the Union. The express denial of the latter right, and omission to deny the former, would seem, on the principle, *expressio unius est exclusio alterius,* to interpret affirmatively the section in favor of the right of a citizen to sue his own state in a federal court.

The ordinary rules of construction would therefore seem to sustain the proposition that of suits against states by their own citizens for rights arising under any clause of the constitution or laws of the United States, the federal courts have jurisdiction, to be regulated in its exercise by such laws as congress may prescribe as to practice and forms of procedure; especially in cases in which those citizens are allowed by state laws to sue their own state in state courts.

Passing now to the legislation of congress on this subject, that body in its latest General Statutes relating to the jurisdiction of federal courts has enacted that the circuit courts of the United States shall have cognizance, among other things, of "all suits of a civil nature at common law or in equity," where the matter in controversy exceeds the sum of $500, and "arises under the constitution or laws of the United States." The language of this statute, so far as it regards parties to suits, is just as broad as that of the constitution itself. It makes no exception of suits in which states are parties defendant, and would seem to leave the citizen of any state at liberty to sue his own state in a federal court for any right secured to him, as petitioners in this case have, by the constitution or laws of the United States of which his state has deprived him. If, therefore, a citizen's claim against his state involves the value of $500, and is founded on the constitution or a law of the United States, it would seem that he may bring his suit in a circuit court of the United States, provided it be a "suit at common law or in equity," in the ordinary acceptation of that technical phrase.

The next question to be considered is whether the summary proceeding, by petition now under consideration, is such a proceeding as

the constitution and the statute putting it in force contemplate in the phrase "suit at common law;" for no one pretends that this is a suit in equity.

In regard to suits in equity, the states have no power, direct or indirect, over the procedure in federal courts; and it is questioned whether congress can confer it to any material extent. But the states have been clothed by congres with a large, though indirect, control over the practice of the federal courts in common-law cases. Section 914 of the Revised Statutes of the United States provides, in regard to suits other than those in equity and admiralty, brought in the federal courts, that "the practice, pleadings, and forms and modes of proceeding in civil causes" shall conform as near as may be to the practice, pleadings, and forms and modes of proceeding existing at the time in like causes in the courts of record of the state within which the United States courts are held. This court is therefore authorized to look into the laws of Virginia relating to the practice prescribed to its courts in cases at law, and to determine from those laws whether it has jurisdiction to entertain a proceeding like the one now under consideration.

This proceeding is evidently, and I believe admittedly, founded on the third section of the act of assembly of January 14, 1882, relating to frauds upon the commonwealth, which has already been referred to. That section, as before stated, authorized the method of proceeding which has been pursued in this case to be used in the courts of the state by tax-payers who wished to pay their dues with coupons; and therefore the same procedure, if now admissible in the state courts, would be admissible in this court. The section allowed the tax-payer to sue the state herself, in her own name and person. Accordingly, when this case was first called at bar, and I issued the rule under which the state of Virginia has now appeared, I supposed that the petition could be entertained. But I am confronted to-day by the 114th section of the act for assessing taxes, and for providing a mode of applying for licenses, approved March 15, 1884, heretofore mentioned, which repeals in general terms, as to license taxes, the third section of the act of January 14, 1882, creating this procedure. The conclusion that this 114th section does effect such repeal is inevitable. For section 112 of the same act is in the following words:

"All applications for licenses shall be made, and all taxes assessed by chapter 1 of this act shall be paid, in lawful money of the United States, in the mode and subject to the provisions of an act to regulate the granting of licenses, approved the seventh of February, 1884, and any act amendatory thereto, before any corporation, firm, or person shall be entitled to receive said license, or to transact any business, profession, or calling for which a license is required by chapter 1 of this act."

The act to which this section refers, and which it adopts and makes part of itself, is the act for regulating the granting of licenses, etc., approved February 7, 1884, as amended by another act for the same purpose, approved February 25, 1884. This act, as amended, con-

tains sundry provisions, the object of which is to require the payment of all license taxes exclusively in gold or silver coin, United States treasury notes, or national bank-notes, and stringently forbids the issuing of licenses except upon the payment of the license taxes in the money it describes. It forbids the receiving of coupons, either in payment or for verification, or for any purpose, by forbidding any application for a license to be considered or granted unless all its requirements in regard to payment in money shall have been first fully complied with.

The act of March 30, 1884, having in its 112th section adopted the provisions of the acts of February just described, then goes on, in its 14th section, to repeal the general tax law of 1882, and also to repeal "all acts and parts of acts inconsistent with this act,"— that is to say, inconsistent with any of its own provisions; inconsistent with its 112th section; inconsistent, as a consequence, with the acts of February, 1884. Can this 112th section, adopting the February law, stand and be enforced without rendering null and wholly inoperative the third section of the act of January, 1882, which provides for the verification of coupons and for their reception by the state in payment of license taxes? The two laws are utterly repugnant to and radically inconsistent with each other. A formal repeal was hardly necessary, inasmuch as the law of 1882 was already completely nullified as to license taxes. Yet the 114th section of the law of March gives it the *coup de grace* by repealing it in terms, and thereby abolishing, as to license taxes, the proceeding by summary petition which the law of 1882 gave to license tax-payers who wished to pay their taxes with verified coupons. The law giving this summary remedy in the state courts being abolished, it follows that this proceedure, *ipso facto*, ceases to be admissible in the federal courts.

It may be suggested that a repealing clause, embodied in an unconstitutional act, may itself be unconstitutional by reason of the association in which it is found. The authorities on the subject, however, are to the contrary of this. Judge COOLEY says, in his Constitutional Limitations, (3d Ed. p. 186,) that "where the repealing clause in an unconstitutional statute repeals all inconsistent acts, the repealing clause is to stand and have effect, notwithstanding the invalidity of the rest." See, to the same effect, Dwarris, St. (Potter's Ed. of 1874,) p. 154.

The present proceeding must, therefore, be dismissed for want of jurisdiction in this court to entertain it; and it is so ordered.

See *Baltimore & O. R. Co.* v. *Allen*, 17 FED. REP. 171, and note, 188.—[ED.

---

### NOTE BY JUDGE HUGHES.

The proposition, stated *arguendo* in the foregoing opinion, that a citizen may sue his own state in a circuit court of the United States, on a right given him by the constitution of the Union, of which his state has deprived him,

has naturally given rise to much discussion in Virginia, where there has been recent legislation taking away or affecting the right which she had granted of paying state taxes in coupons cut from her public bonds. In consequence of that *dictum* many suits have been already brought, and many more are likely to be brought, directly against the state in the United States circuit courts held in the judicial districts of Virginia. It is therefore proper that a more detailed statement of the grounds of the opinion should be appended · to it.

The proposition that a citizen, who has been injured in a constitutional right by his own state, may sue that state in an inferior federal court is a novel if not a startling one. It is probable that such a suit has never before been brought. It is certain that it could not have been brought before the passage of the judiciary act of March 3, 1875, (Supp. Rev. St. 173, and 18 St. 470;) yet the language of section 2 of article 3 of the constitution of the United States seems to extend the judicial power of the United States to such suits. That language is that this power shall extend to "all cases in law and equity arising under this constitution, the laws of the United States, and treaties," etc. There is not, in the clause itself, or in any other provision of the constitution, an exception from this grant of suits brought against states by their own citizens. It is true that the second paragraph of the same section of the constitution provides that, in cases in which a state shall be a party, the supreme court of the United States shall have original jurisdiction; and Mr. Alexander Hamilton, in the eighty-first number of the *Federalist*, indicated the belief that the jurisdiction granted by this clause was intended to be an *exclusive* "original jurisdiction." But the first congress, that of 1789, construed the grant otherwise in section 13 of the first judiciary act; and the supreme and circuit courts of the United States have in repeated decisions held that the constitution, in giving original jurisdiction to the supreme court of causes in which states are parties, did not intend that that jurisdiction should be exclusive. These decisions are reviewed in the very recent .case of *Ames* v. *Kansas*, 111 U. S. 449, and 4 Sup. Ct. Rep. 437, in a decision in which the supreme court of the United States reiterated that proposition.

Section 2 of article 3 of the constitution having granted the jurisdiction under consideration, the only question is whether congress by legislation has authorized the federal courts to exercise it. Let it be borne in mind that as to the appellate jurisdiction of the supreme court, and all the jurisdiction of the circuit and district courts of the United States, the constitution does not, *proprio vigore*, confer jurisdiction, but has granted a large fund of it which congress may or not bring into exercise. Although congress was slow to utilize all the jurisdiction authorized by the constitution, yet, since 1875, it may be said to have well nigh brought the whole into requisition.

As early as 1789 congress granted appellate jurisdiction to the supreme court in all cases authorized by section 2 of article 3; that is to say, by the twenty-fifth section of the judiciary act of 1789, (now modified into section 709, Rev. St.,) congress authorized the supreme court to review on appeal all judgments and decrees of the courts of highest resort in the states, in cases where is drawn in question the validity of any state statute alleged to be repugnant to the constitution, or to a law or to a treaty of the United States, in which the decision of such court was in favor of the validity of such state statute. This is but the gist of the principal clause of the section, which is very comprehensive in its grant of jurisdiction. The effect and intent of this section, as affecting suits brought against their own states by citizens appealing under it to the supreme court of the United States, was carefully discussed by Chief Justice MARSHALL in the case of *Cohen* v. *Virginia*, 6 Wheat. 378 *et seq.*, extracts from which are given below. The learned chief justice maintained in that case, as early as 1821, that under the section of the constitution which we are considering, as put in force by section 25 of the judi-

ciary act of 1789, a citizen might sue his own state by appeal in the supreme court of the United States, when deprived by her of a constitutional right.

It was not until the passage of the judiciary act of March 3, 1875, that congress gave to the circuit courts of the United States jurisdiction, as authorized by section 2 of article 3, of all cases arising under the constitution, or a law or treaty of the United States. In this act such jurisdiction was given without exception as to the parties to suits, or their character. The act of 1789 had given jurisdiction to the supreme court in all cases of this class, without respect to amounts (which might be ever so small) or as to parties. The jurisdiction given by the act of 1875 to the circuit courts is equally without exception as to parties, but as to amounts is limited to suits where the matters in controversy are not less than $500 in value. The effect and intent of the act of 1875, in respect to states or parties, was discussed with care by Chief Justice WAITE in the case, before mentioned as very recently decided, of *Ames* v. *Kansas*, extracts from which are given below.

*First*, let us see what was said on the question whether a citizen could sue his own state in a federal court for a federal right of which she had deprived him, in the case of *Cohen* v. *Virginia*. The state of Virginia had proceeded against her own citizen in one of her own courts by indictment, and deprived him of a right given him by a law of congress. Whereupon the citizen sued the state by appeal in the supreme court of the United States, under section 25 of the judiciary act of 1789. One of the objections urged against the jurisdiction was that a state was a party. Chief Justice MARSHALL, among other things, said, (page 378:) "The first question to be considered is whether the jurisdiction of this court is excluded by the character of the parties, one of them being a state and the other a citizen of that state. The second section of the third article of the constitution defines the extent of the judicial power of the United States. It gives jurisdiction to the courts of the Union in two classes of cases. In the first their jurisdiction depends on the character of the cause, whoever may be the parties. This class comprehends all cases in law and equity arising under this constitution, the laws of the United States, and treaties made under their authority. This clause extends the jurisdiction of the court to all cases described, without making in its terms any exception whatever, and without any regard to the condition of the party. If there be any exception, it is to be implied against the express words of the article. In the second class the jurisdiction depends entirely on the character of the parties."

On page 391 of the opinion this passage occurs: "It is to give jurisdiction, where the character of the parties would not give it, that the important part of the clause which extends the judicial power to all cases arising under the constitution and laws of the United States was inserted. If jurisdiction depended entirely on the character of the parties, and was not given where the parties have not an original right to come into court, that clause would be mere surplusage."

Page 382: The judicial power of the United States "is authorized to decide all cases of every description arising under the constitution or laws of the United States. From this general grant of jurisdiction no exception is made of those cases in which a state may be a party. When we consider the situation of the government of the Union and of a state, in relation to each other; the nature of our constitution; the subordination of the state government to that constitution; the great purpose for which jurisdiction over all cases arising under the constitution and laws of the United States is confided to the judicial department,—are we at liberty to insert, in this general grant, an exception of those cases in which a state may be a party? Will the spirit of the constitution justify this attempt to control its words? We think it will not. We think a case arising under the constitution or laws of the United

States is cognizable in the courts of the Union, *whoever may be the parties.* * * *"

Page 383: "The constitution gives to every person having a claim upon a state a right to submit his case to the courts of the nation. However unimportant his claim may be, however little the community may be interested in its decision, the framers of our constitution thought it necessary for the purposes of justice to provide a tribunal, as superior to influence as possible, in which that claim might be decided. Can it be imagined that the same persons considered a case involving the constitution of our country and the majesty of the laws, questions in which every American citizen must be deeply interested, as withdrawn from this tribunal because a state is a party? * * *"

Page 390: "It has been urged, as an additional objection to the jurisdiction of this court, that cases between a state and one of its own citizens do not come within the general scope of the constitution, and were obviously never intended to be made cognizable in the federal courts. * * * It may be true that the partiality of the state tribunals, in ordinary controversies between a state and its citizens, was not apprehended, and therefore the judicial power of the Union was not extended to such cases; but this was not the sole nor the greatest object for which this department was created. A more important and much more interesting object was the preservation of the constitution and laws of the United States, so far as they can be preserved by judicial authority; and therefore the jurisdiction of the courts of the Union was expressly extended to all cases arising under that constitution and those laws. If the constitution or laws may be violated by proceedings instituted by a state against its own citizens, and if that violation may be such as essentially to affect the constitution and the laws, such as to arrest the progress of government in its constitutional course, why should these cases be excepted from that provision which expressly extends the judicial power of the Union to *all* cases arising under the constitution and laws? After bestowing on this subject the most attentive consideration, the court can perceive no reason, founded on the character of the parties, for introducing an exception which the constitution has not made; and we think that the judicial power, as originally given, extends to all cases arising under the constitution, or a law of the United States, *whoever may be the parties.*"

This language is too explicit to admit of doubtful interpretation. So far as the authority of Chief Justice MARSHALL can establish it, the doctrine is true that the constitution does authorize a citizen to sue his own state in a federal court for a right given him by the constitution or a law of the United States of which his state has deprived him.

The language of the court in the late case of *Ames* v. *Kansas* is equally as explicit. It refers to and adopts the language of Judge MARSHALL in *Cohen* v. *Virginia.* That was a case in which Kansas had sued its own citizen (a railway company) in one of its own courts to question a right claimed by the company under a law of congress. The company removed the case into the circuit court of the United States, under the act of March 3, 1875. On denial by this court of a motion to remand, appeal was taken by the state to the supreme court of the United States. As to the removal, the company was in the relation of actor or plaintiff, and the state in that of defendant. The question was whether the federal court could take cognizance, as against the state and against her will, of a suit in which the state was a party. The supreme court, following the reasoning of Judge MARSHALL in *Cohen* v. *Virginia,* held that the circuit court had, after removal, rightful cognizance of the suit. After discussing at length the question whether, in the second paragraph of section 2, art. 3, of the constitution, which gives "original jurisdiction" to the supreme court of cases in which a state is a party, it was intended that that jurisdiction should be *exclusive,* and after reviewing section

13 of the judiciary act of 1789, and the cases in which the contrary view had been held, Chief Justice WAITE, in the concluding paragraphs of the decision, said:

"In view of the practical construction put upon this provision of the constitution by congress at the moment of the organization of the government, and of the significant fact that from 1789 until now no court of the United States has ever, in its actual adjudication, determined to the contrary, we are unable to say that it is not within the power of congress to grant to the inferior courts of the United States jurisdiction in cases where the supreme court has been vested by congress with original jurisdiction. It rests with the legislative department of the government to say to what extent such grants shall be made. * * * We are unwilling to say that the power does not exist.

"It remains to consider whether jurisdiction has been given to circuit courts of the United States in cases of this kind. As has been seen, it was not given by the judiciary act of 1789, and it did not exist in 1873, when the case of *Wisconsin* v. *Duluth*, 2 Dill. 406, was decided by Mr. Justice MILLER on the circuit. But the act of March 3, 1875, c. 137, (18 St. 470,) 'to determine the jurisdiction of circuit courts, and to regulate the removal of causes from the state courts, and for other purposes,' does, in express terms, provide that the circuit courts of the United States shall have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature, at common law or in equity, * * * arising under the constitution or laws of the United States;' and also that suits of the same nature, begun in a state court, may be removed to the circuit courts. * * * The only question we have to consider, therefore, is whether suits cognizable in the courts of the United States on account of the nature of the controversy, and which need not be brought originally in the supreme court, may now be brought in or removed to the circuit courts, without regard to the character of the parties. All admit that the act does give the requisite jurisdiction in suits where a state is not a party; so that the real question is whether the constitution exempts the states from its operation. The same exemption was claimed in *Cohen* v. *Virginia* to show that the appellate jurisdiction of this court did not extend to the review of the judgment of a state court [rendered] in a suit by a state against one of its own citizens; but Chief Justice MARSHALL said: [here quoting some of the passages already quoted above.] The language of the act of 1875, in this particular, is identical with that of the constitution, and the evident purpose of congress was to make the original jurisdiction of the circuit courts co-extensive with the judicial power in all cases where the supreme court had not already been invested by law with exclusive cognizance * * * The judicial power of the United States extends to *all* cases arising under the constitution and laws, and the act of 1875 commits the exercise of that power to the circuit courts. It rests, therefore, on those who would withdraw any case within that power from the cognizance of the circuit courts, to sustain their exception on the spirit and true meaning of the act, which spirit and true meaning must be so apparent as to overrule the words its framers have employed. To the extent that the words conflict with other laws giving exclusive jurisdiction to this court, this has been done, *but no more.*"

The court accordingly gave judgment sustaining the jurisdiction of the circuit court of the United States in Kansas to hear and decide the case.

Can there be any doubt that this language of Chief Justice WAITE as conclusively settles the question under consideration as to the circuit courts, as that of Chief Justice MARSHALL did as to the appellate jurisdiction of the supreme court? There certainly cannot be. Still, the maxim remains true that a sovereign state cannot be sued except in a manner and in a forum consented to by itself. But let it be remembered that the constitution of the

Union is no more nor less than a grant by the states to the Union of the powers which it enumerates. And the very question which we have been discussing is whether or not section 2, art. 3, is a grant of the power and jurisdiction under consideration. If it is, as is held by the two chief justices, then the state of Virginia has consented to be sued in the federal courts in the cases embraced by that section, and the question is at end.