## STATE OF ARKANSAS v. KANSAS & T. COAL CO. et al.

### (Circuit Court, W. D. Arkansas, Ft. Smith Division. September 2, 1899.)

1. REMOVAL OF CAUSES—JURISDICTION OF FEDERAL COURT—AMOUNT INVOLVED.

The state of Arkansas, at the relation of a prosecuting attorney, filed a bill in one of her own courts against the Kansas & Texas Coal Company and the St. Louis & San Francisco Railroad Company, both corporations organized under the laws of the state of Missouri, alleging that the coal company was threatening and about to import into one of the towns and counties in said state, over the line of its co-defendant's railroad, a large number of armed men of the low and lawless type of humanity, to wit, about 200, to the great danger of the public peace, morals, and good health of said town and county. The defendants removed the case to this court, whereupon the plaintiff moved to remand the same for reasons which will appear in the opinion. *Held*, the amount involved in a suit for an injunction for the purpose of determining the jurisdiction of a federal court is the value of the right to be protected, or the extent of the injury to be prevented, by the injunction.[1]

2. SAME—CITIZENSHIP.

A suit between a state and a citizen or corporation of another state is not a suit between citizens of different states, and a circuit court of the United States has no jurisdiction of it on the ground of diverse citizenship.[2]

3. SAME.

In Railroad Co. v. James, 16 Sup. Ct. 621, 161 U. S. 545, it is decided that said railroad company is a Missouri corporation.

4. SAME—FEDERAL QUESTION.

The plaintiff's complaint, on its face, raises a federal question under the interstate commerce clause of, as well as under the fourteenth amendment to, the constitution of the United States, and therefore this court has jurisdiction thereof on removal.[3]

5. CONSTITUTIONAL LAW—POWER OF STATE—LABORERS ENTERING STATE.

No statute of this state inhibits the class of persons described in the bill coming into this state. It will be time enough to decide whether the state has the power to prohibit their coming when a proper case, based on such a statute, is brought to the attention of the court. Under the fourteenth amendment, and under the interstate commerce clause, of the constitution, they now have that right.

6. SAME—REGULATION BY COURTS.

It is not within the power of any court, state or federal, to prescribe what rules and regulations are needful to the welfare, peace, health, safety, and morals of the state, or to determine, without legislation, what class or classes of persons may lawfully come therein. That power belongs to the legislatures of the states, and must be exercised within constitutional bounds.

7. INJUNCTION—DISSOLUTION.

The class of persons described in the bill having the right to come into the state, the injunction granted by the state court preventing their coming into the state is dissolved.

---

[1] As to jurisdiction of federal courts as dependent on amount in controversy, see note to Auer v. Lombard, 19 C. C. A. 75, and, supplementary thereto, note to Tennent-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.

[2] As to diverse citizenship as a ground for federal jurisdiction, see note to Shipp v. Williams, 10 C. C. A. 249, and, supplementary thereto, note to Mason v. Dullagham, 27 C. C. A. 298.

[3] As to jurisdiction in cases involving federal question, see note to Bailey v. Mosher, 11 C. C. A. 308, and, supplementary thereto, note to Montana Ore-Purchasing Co. v. Boston & M. Consol. Copper & Silver Min. Co., 35 C. C. A. 7.

**8. SAME—RESTRAINING PROSECUTION.**
The motion for a restraining order to prevent the state from the prosecution of the suit in the state court, notwithstanding the removal to this court, is overruled.

(Syllabus by the Court.)

## On Motions to Dismiss and to Restrain Prosecution of Suit in State Court.

On April 23, 1899, this cause was brought by the state (at the relation of Jo Johnson, prosecuting attorney for the Twelfth judicial circuit) in the circuit court of Sebastian county for the Greenwood district, in the state of Arkansas. From the complaint it appears that both defendant companies are Missouri corporations; that the defendant coal company (hereinafter designated "Coal Company," for convenience), when the bill was filed, owned and was operating a coal mine at Huntington, in said Greenwood district of Sebastian county, and that the defendant railroad company (hereinafter designated "Railroad Company," for convenience) owned and operated a railroad in said county and Twelfth judicial circuit. Omitting, for the purposes of this motion, irrelevant matter, the bill charges "that the defendant Coal Company is threatening and is about to import into said county [Sebastian], and town of Huntington, over a line of their co-defendant's railroad, a large number of armed men of the low and lawless type of humanity, to wit, about two hundred, to the great danger of the public peace, morals, and good health of said county, and more particularly of said town." On the 18th of July, 1899, the defendants filed a joint petition in said court, accompanied by a bond in the usual form, and prayed for an order of removal of this case to this court. The order of removal was denied by the state court, and thereupon the defendant companies procured, and afterwards, on the 25th of July, 1899, caused to be filed in this court, a transcript of all the proceedings of the state court. On August 7, 1899, the state filed in this court a motion to dismiss the case for the following reasons: (1) Because the petition for removal and transcript of the record of the circuit court of Sebastian county for the Greenwood district thereof show that it is not removable to this court, under the laws of the United States; (2) because the state of Arkansas being plaintiff, and defendants alleged to be citizens of the state of Missouri, this court could acquire no jurisdiction on the ground of diverse citizenship; (3) because the record aforesaid shows it is not a civil action for the enforcement of a right arising under the constitution and laws of the United States, or treaties made under their authority, or arose under the constitution, laws, and treaties aforesaid; (4) because, under the constitution and laws of the state of Arkansas the St. Louis & San Francisco Railroad Company, one of the defendants, is a domestic corporation, and is subject to the jurisdiction of the courts of said state.

Ben T. Duval, for plaintiff.
Hill & Brizzolara, for defendants.

ROGERS, District Judge (after stating the facts as above). Counsel who filed the motion to dismiss has made no point with reference to the first paragraph of the motion, and it is not necessary to consider it, unless it be intended thereby to raise the question that it does not appear that the amount in controversy exceeds the sum of $2,000. That question is res adjudicata in this court. Humes v. City of Ft. Smith, 93 Fed. 857. See, also, Railroad Co. v. Ward, 2 Black, 485.

It has been held that a state is not a citizen. And under the judiciary acts of the United States it is well settled that a suit between a state and a citizen or corporation of another state is not between citizens of different states, and that the circuit court of the United States has no jurisdiction of it, unless it arises under the constitution, laws, or treaties of the United States. Ames v. Kansas,

111 U. S. 449, 4 Sup. Ct. 437; Stone v. South Carolina, 117 U. S. 430, 6 Sup. Ct. 799; Germania Ins. Co. v. Wisconsin, 119 U. S. 473, 7 Sup. Ct. 260. The second paragraph of the motion to dismiss, therefore, is well taken.

The fourth paragraph of the motion has been settled adversely to the motion in the case of Railway Co. v. James, 161 U. S. 545, 16 Sup. Ct. 621.

Nothing remains to consider except the third paragraph of the motion. It is conceded, and is settled law, that under the act of August 13, 1888, a case (not depending on the citizenship of the parties, nor otherwise specially provided for) cannot be removed from a state court into the circuit court of the United States as one arising under the constitution, laws, or treaties of the United States, unless that appears by the plaintiff's statement of his own claim; and, if it does not so appear, the want cannot be supplied by any statement in the petition for removal, or in the subsequent pleadings. Tennessee v. Union & Planters' Bank, 152 U. S. 454, 14 Sup. Ct. 654; Chappell v. Waterworth, 155 U. S. 102, 15 Sup. Ct. 34; Postal Tel. Cable Co. v. Alabama, 155 U. S. 482, 15 Sup. Ct. 192; Land Co. v. Brown, 155 U. S. 488, 15 Sup. Ct. 357; Railroad Co. v. Cody, 166 U. S. 607, 17 Sup. Ct. 703; Walker v. Collins, 167 U. S. 57, 17 Sup. Ct. 738. The cases cited make it clear that in determining whether or not the present case is a suit of a civil nature arising under the constitution or laws of the United States, or treaties made or which shall be made under their authority, must be determined by an examination of the complaint itself, and not by anything which is found either in the petition for removal or in any subsequent pleadings filed. Attention is therefore directed to an examination of adjudged cases determining when a suit is one "arising under the constitution or laws of the United States," etc. In Tennessee v. Union & Planters' Bank, 152 U. S. 459–462, 14 Sup. Ct. 654, 656, it was said:

"The earliest act of congress which conferred on the circuit courts of the United States general jurisdiction of suits of a civil nature, at common law or in equity, 'arising under the constitution, or laws of the United States, or treaties made or which shall be made under their authority,' was the act of March 3, 1875, c. 137 (18 Stat. 470). Under section 1 of that act, providing that those courts should have original cognizance of such suits when the matter in dispute exceeded the sum or value of $500, their jurisdiction was exercised in cases in which the plaintiff's statement of his cause of action showed that he relied on some right under the constitution or laws of the United States. Feibelman v. Packard, 109 U. S. 421, 3 Sup. Ct. 289; Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 5 Sup. Ct. 208; New Orleans v. Houston, 119 U. S. 265, 7 Sup. Ct. 198; Bachrack v. Norton, 132 U. S. 337, 10 Sup. Ct. 106; Cooke v. Avery, 147 U. S. 375, 13 Sup. Ct. 340. And under section 2 of that act, which provided that any suit of a civil nature, at law or in equity, brought in any state court, 'and arising under the constitution or laws of the United States, or treaties made or which shall be made under their authority,' might be removed by either party into the circuit court of the United States, it was held sufficient to justify a removal by the defendant that the record at the time of the removal showed that either party claimed a right under the constitution or laws of the United States. Railroad Co. v. Mississippi, 102 U. S. 135; Ames v. Kansas, 111 U. S. 449, 462, 4 Sup. Ct. 437; Brown v. Houston, 114 U. S. 622, 5 Sup. Ct. 1091; Society v. Ford, 114 U. S. 635, 642, 5 Sup. Ct. 1104; Pacific Railroad Removal Cases, 115 U. S. 1, 5 Sup. Ct. 1113; Tennessee v. Whitworth, 117 U. S. 129, 139, 6 Sup. Ct. 645, 649; Southern

Pac. R. Co. v. California, 118 U. S. 109, 16 Sup. Ct. 993; Bock v. Perkins, 139 U. S. 628, 11 Sup. Ct. 677. But, as has been decided under that act, 'the suit must be one in which some title, right, privilege, or immunity on which the recovery depends will be defeated by one construction of the constitution, or a law or treaty of the United States, or sustained by a contrary construction.' Carson v. Dunham, 121 U. S. 421, 427, 7 Sup. Ct. 1030, 1033. 'A cause cannot be removed from a state court simply because, in the progress of the litigation, it may become necessary to give a construction to the constitution or laws of the United States (Water Co. v. Keyes, 96 U. S. 199, 203); and the question whether a party claims a right under the constitution or laws of the United, States is to be ascertained by the legal construction of its own allegations, and not by the effect attributed to those allegations by the adverse party.' Railroad Co. v. Mills, 113 U. S. 249, 257, 5 Sup. Ct. 456, 459. Even under the act of 1875 the jurisdiction of the circuit court of the United States could not be sustained over a suit originally brought in that court, upon the ground that the suit was one arising under the constitution, laws, or treaties of the United States, unless that appeared in the plaintiff's statement of his own claim. This was distinctly adjudged, and the reasons clearly stated, in Metcalf v. Watertown, 128 U. S. 586, 589, 9 Sup. Ct. 173, 174, in which Mr. Justice Harlan, after pointing out that the cases in which it had been held sufficient that the federal question upon which the case depended was first presented by the answer or plea of the defendant, were cases of removal, in which, therefore, the requisite of jurisdiction appeared on the record at the time when the jurisdiction of the circuit court of the United States attached, said: 'Where, however, the original jurisdiction of a circuit court of the United States is invoked upon the sole ground that the determination of the suit depends upon some question of a federal nature, it must appear at the outset, from the declaration or the bill of the party suing, that the suit is of that character; in other words, it must appear, in that class of cases, that the suit was one of which the circuit court, at the time its jurisdiction is invoked, could properly take cognizance. If it does not so appear, then the court, upon demurrer or motion, or upon its own inspection of the pleading, must dismiss the suit; just as it would remand to the state court a suit which the record, at the time of removal, failed to show was within the jurisdiction of the circuit court. It cannot retain it in order to see whether the defendant may not raise some question of a federal nature upon which the right of recovery will finally depend; and, if so retained, the want of jurisdiction at the commencement of the suit is not cured by an answer or plea which may suggest a question of that kind.' That view has been affirmed and acted on at the present term in Mining Co. v. Turck, 150 U. S. 138, 143, 14 Sup. Ct. 35, 37. The same rule applies more comprehensively to the acts of 1887 and 1888. In section 1, as thereby amended, the words giving original cognizance to the circuit courts of the United States in this class of cases are the same as in the act of 1875 (except that the jurisdictional amount is fixed at $2,000), and it is therefore essential to their jurisdiction that the plaintiff's declaration or bill should show that he asserts a right under the constitution or laws of the United States. But the corresponding clause in section 2 allows removals from a state court to be made only by defendants, and of suits 'of which the circuit courts of the United States are given original jurisdiction by the preceding section,' thus limiting the jurisdiction of a circuit court of the United States on removal by the defendant under this section to such suits as might have been brought in that court by the plaintiff under the first section. 24 Stat. 553; 25 Stat. 434. The change is in accordance with the general policy of these acts, manifest upon their face, and often recognized by this court, to contract the jurisdiction of the circuit courts of the United States. Smith v. Lyon, 133 U. S. 315, 320, 10 Sup. Ct. 303; In re Pennsylvania Co., 137 U. S. 451, 454, 11 Sup. Ct. 141; Fisk v. Henarie, 142 U. S. 459, 467, 12 Sup. Ct. 207; Shaw v. Mining Co., 145 U. S. 444, 449, 12 Sup. Ct. 935; Martin's Adm'r v. Railroad Co., 151 U. S. 673, 687, 14 Sup. Ct. 533."

In Ames v. Kansas, 111 U. S. 462, 4 Sup. Ct. 443, Chief Justice Waite, delivering the opinion of the court, and sustaining its jurisdiction, said:

"The right set up by the company, and by the directors as well, will be defeated by one construction of these acts and sustained by the opposite construction. When this is so, it has never been doubted that a case is presented which arises under the laws of the United States,"—citing Cohens v. Virginia, 6 Wheat. 264, 379; Water Co. v. Keyes, 96 U. S. 201; Railroad Co. v. Mississippi, 102 U. S. 140.

In Starin v. City of New York, 115 U. S. 257, 6 Sup. Ct. 31, the same learned chief justice said:

"The character of a case is determined by the questions involved. Osborn v. President, etc., 9 Wheat. 737, 824. If from the questions it appears that some title, right, privilege, or immunity on which recovery depends will be defeated by one construction of the constitution or a law of the United States, or sustained by the opposite construction, the case will be one arising under the constitution or laws of the United States, within the meaning of that term as used in the act of 1875; otherwise not. Such is the effect of the decisions on this subject,"—citing Cohens v. Virginia, 6 Wheat. 264; Osborn v. President, etc., 9 Wheat. 737; Mayor v. Cooper, 6 Wall. 247; Water Co. v. Keyes, 96 U. S. 199; Tennessee v. Davis, 100 U. S. 257; Railroad Co. v. Mississippi, 102 U. S. 135; Ames v. Kansas, 111 U. S. 449, 4 Sup. Ct. 437; Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 5 Sup. Ct. 208; Society v. Ford, 114 U. S. 635, 5 Sup. Ct. 1104; Pacific Railroad Removal Cases, 115 U. S. 1, 5 Sup. Ct. 1113.

In Southern Pac. R. Co. v. California, 118 U. S. 112, 6 Sup. Ct. 993, the same learned chief justice approved Railroad Co. v. Mississippi, supra, Ames v. Kansas, supra. Starin v. City of New York, supra, quoting the same language which he had previously used in Starin v. City of New York. In Germania Ins. Co. v. Wisconsin, 119 U. S. 475, 7 Sup. Ct. 260, the same learned chief justice again reiterated the same doctrine, using the same language which had been used in Ames v. Kansas, supra.

In Minnesota v. Duluth & I. R. R. Co., 87 Fed. 498, Judge Lochren, delivering the opinion of the court, calls attention to what has been held in Tennessee v. Union & Planters' Bank, supra, Starin v. City of New York, supra, and Carson v. Dunham, supra, and further states that on the precise point under consideration the decisions under the act of March 3, 1887, are equally applicable to the act of August 13, 1888. He then says:

"To give the United States circuit court jurisdiction, it is not necessary that it should appear that plaintiff's right to recover is based upon and supported by some provision of the constitution or statutes of the United States. A federal question is equally presented if it appears from plaintiff's statement of facts that a construction which may be fairly claimed and contended for of a provision of such constitution or statutes would defeat plaintiff's right to recover."

In Lowry v. Railroad Co., 46 Fed. 83, Judge Caldwell said:

"It is enough that there is a federal question in the case, whether it is relied on by the plaintiff or the defendant. A case arises under a law of the United States wherever that law is the basis of the right or privilege or claim or protection or defense of the party, in whole or in part, by whom it is set up."

To the cases cited might be added many others to the same effect. These, however, suffice to show and establish the rule. It remains to apply the principles declared to the case at bar. In the examination of the complaint for the purposes of this motion, its crudities, or the insufficiency of facts to warrant the relief sought, if such be the

case, are not open to attack or criticism, since defects in these regards may be corrected by amendments in either of the courts having jurisdiction, if the facts warrant. This court is limited now to the question as to whether, at the time the jurisdiction of this court was invoked, it appeared from the plaintiff's complaint that the controversy between the parties involved a federal question. The substantial and material allegations of fact in the complaint is (and it is the only allegation of fact in it which is considered substantial and material) that the defendant Coal Company "is threatening and is about to import into said county, and town of Huntington, over the line of their co-defendant's railroad, a large number of armed men of the low and lawless type of humanity, to wit, about two hundred." The allegations as to what results would follow such importations are merely conjectural or speculative, or at most a matter of opinion upon the part of the relator, depending, of course, upon the type of men imported, and their physical, financial, and moral conditions. Of these conditions it does not appear that the relator knows anything. No facts appear from which it may be seen what the character of the nuisance is which their importation will produce, or in what way the peace, morals, or health of the state and the town will be affected, or in what way riot and bloodshed would be brought about, or the nature and character of the contagious or infectious diseases they would disseminate. It is not even alleged that they now have, or have been subjected to, any such diseases. All these matters are purely speculative. The contention on the part of the plaintiff is that, under the police power of the state, it has the right to prevent the defendant Coal Company from importing into the state, and to prevent the defendant Railroad Company from transporting over its road, the class of persons described in the complaint as "armed men of the low and lawless type of humanity." The contention of the defendants is that the exercise of such a power is in violation of the interstate commerce law and of the fourteenth amendment to the constitution of the United States. On this motion to dismiss or remand my sole duty is to ascertain if any such defense can be fairly claimed or contended for. The merits of the question are not now involved, and should not be determined, except so far as may be necessary in order to determine whether the state's contention involves an invasion of the powers confided to the United States under its constitution or statutes; or, to state it differently, and within the language of the adjudged cases, whether it appears from plaintiff's statement of facts that a construction which may be fairly claimed and contended for of a provision of the constitution or statutes of the United States would defeat plaintiff's right to relief. It is not specifically alleged in the complaint that the defendant railroad company is engaged in interstate commerce. It is alleged that it is a Missouri corporation, and that its co-defendant had threatened and was about to import, over the line of said railroad, a certain designated type of men. It was not argued at the hearing that said company was not engaged in interstate commerce in the transportation of the men referred to, and it is fairly to be deduced from the complaint that such was true. The word "import" itself implies a bringing of men either from a for-

eign country or another state into this state. The same is true of the defendant Coal Company. The employment and shipment of men from other states into Arkansas over its co-defendant's railroad is interstate commerce.

It was argued at the bar that coal mining was not interstate commerce. That is true. This court so held in U. S. v. Boyer, 85 Fed. 425, where a full discussion of what it takes to constitute interstate commerce, and a collation of adjudged cases, may be found, and from which it was deduced that:

"When the [interstate] commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state. At that time the power and regulating authority of the state ceases, and that of congress attaches and continues until it has reached another state, and become mingled with the general mass of the property in the latter state. That neither the production or manufacture of articles or commodities which constitute subjects of commerce, and which are intended for trade and traffic with citizens of other states, nor the preparation for their transportation from the state where produced or manufactured prior to the commencement of the actual transfer or transmission thereof to another state, constitutes that interstate commerce which comes within the regulating power of congress. In re Greene, 52 Fed. 113."

But interstate commerce is not confined to goods, wares, and merchandise. It embraces passengers. It was not argued otherwise at the hearing.

In Railroad Co. v. Husen, 95 U. S. 469, which is a case growing out of the statute of the state of Missouri (1 Wag. St. p. 251, § 1) providing that "no Texas, Mexican or Indian cattle shall be driven, or otherwise conveyed into, or remain, in any county of this state, between the first day of March and the first day of November, in each year, by any person or persons whatsoever," the court, in holding the statute unconstitutional because it violated the interstate commerce clause of the federal constitution, said:

"It seems hardly necessary to argue at length that, unless the statute can be justified as a legitimate exercise of the police power of the state, it is a usurpation of the power vested exclusively in congress. It is a plain regulation of interstate commerce, a regulation extending to prohibition. Whatever may be the power of a state over commerce that is completely internal, it can no more prohibit or regulate that which is interstate than it can that which is with foreign nations. Power over one is given by the constitution of the United States to congress in the same words in which it is given over the other, and in both cases it is necessarily exclusive. That the transportation of property from one state to another is a branch of interstate commerce is undeniable, and no attempt has been made in this case to deny it. The Missouri statute is a plain interference with such transportation, an attempted exercise over it of the highest possible power,—that of destruction. It meets at the borders of the state a large and common subject of commerce, and prohibits its crossing the state line during two-thirds of each year, with a proviso, however, that such cattle may come across the line loaded upon a railroad car or steamboat, and pass through the state without being unloaded. But even the right of steamboat owners and railroad companies to transport such property through the state is loaded by the law with onerous liabilities, because of their agency in the transportation. The object and effect of the statute are, therefore, to obstruct interstate commerce, and to discriminate between the property of citizens of one state and that of citizens of other states. This court has heretofore said that interstate transportation of passengers is be-

yond the reach of a state legislature. And if, as we have held, state taxation of persons passing from one state to another, or a state tax upon interstate transportation of passengers, is prohibited by the constitution because a burden upon it, a fortiori, if possible, is a state tax upon the carriage of merchandise from state to state. Transportation is essential to commerce, or rather it is commerce itself; and every obstacle to it, or burden laid upon it by legislative authority, is regulation. State Freight Tax Case, 15 Wall. 232; Ward v. Maryland, 12 Wall. 418; Welton v. Missouri, 91 U. S. 275; Henderson v. Mayor, 92 U. S. 259; Chy Lung v. Freeman, Id. 275. The two latter of these cases refer to obstructions against the admission of persons into a state, but the principles asserted are equally applicable to all subjects of commerce."

It will be observed that the Missouri statute under discussion was a prohibitory statute. In the case at bar the bill is based on no statute. No statute has been referred to as relating to such persons as are designated in the bill. The court knows of none. Indeed, there is none. The state, through its legislature, has not attempted to exercise its police power in this regard. It is an attempt to have the court declare what the law of the state is, or what measures are needful to the state in this behalf, without any expression whatever of the legislative department of the state, and to declare that the designated type of persons mentioned in the bill shall not be brought into the state at all, at any time, by the defendants. It is absolutely and unconditionally prohibitory of the designated class. It may well be inquired whether a state court can lawfully declare, independent of any statute, and independent of the common law, as adopted by statute, what the policy of the state is with reference to persons coming thereto. I have found no case in which it has been done. I find no author who recognizes any such doctrine. All the cases examined have arisen out of statutes alleged to be unauthorized by the police power, or powers reserved to the states. I need not allude to the anomalous condition which would result from prohibiting the defendants in this case from bringing persons into the state of the class designated, and leaving all other companies, and all other persons, the privilege of doing so at their pleasure, for this only tends to show that the police power of the state in this behalf should be exercised by the legislature, and applied to all persons alike. On this point, Prentice, in his work on Police Powers (page 31), says:

"It belongs to the legislative branch of the government to determine primarily what measures are appropriate and needful for the protection of the public morals, the public health, or the public safety."

In Mugler v. Kansas, 123 U. S. 661, 8 Sup. Ct. 297, one of the questions was as to what authority should determine whether the manufacture of particular articles of drink would injuriously affect the public. This question grew out of a law prohibiting the manufacture or sale of liquor in that state. The court said:

"Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the 'police powers' of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety."

As tending to establish the correctness of this doctrine, in Railroad Co. v. Husen, 95 U. S. 470, it is said:

"We admit that the deposit in congress of the power to regulate foreign commerce and commerce among the states was not a surrender of that which may

properly be denominated 'police power.' What that power is it is difficult to define with sharp precision. It is generally said to extend to making regulations promotive of domestic order, morals, health, and safety. As was said in Thorpe v. Railroad Co., 27 Vt. 149: 'It extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the state. According to the maxim, "Sic utere tuo ut alienum non lædas," which, being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others.' It was further said that by the general police power of a state 'persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be, made, so far as natural persons are concerned.' It may also be admitted that the police powers of a state justifies the adoption of precautionary measures against social evils. Under it a state may legislate to prevent the spread of crime, or pauperism, or disturbance of the peace. It may exclude from its limits convicts, paupers, idiots, and lunatics, and persons likely to become a public charge, as well as persons afflicted by contagious or infectious diseases,--a right founded, as intimated in the Passenger Cases, 7 How. 283, by Mr. Justice Greer, in the sacred law of self-defense. Vide Tomlinson v. Hewett, 2 Sawy. 283, Fed. Cas. No. 14,087. The same principle, it may also be conceded, would justify the exclusion of property dangerous to the property of citizens of the state; for example, animals having contagious or infectious diseases. All these exertions of power are in immediate connection with the protection of persons and property against noxious acts of other persons, or such a use of property as is injurious to the property of others. They are self-defensive. But, whatever may be the nature and reach of the police power of a state, it cannot be exercised over a subject confided exclusively to congress by the federal constitution."

See, also, People v. Gillson (N. Y.) 17 N. E. 343.

It will be seen, therefore, that ordinarily, at least, the exercise of what is known as the "police power" of the state is confided to its legislature. But, to recur to the question, is it within the power of the state to enact legislation prohibiting the class of persons designated in the bill coming into the state? If the state cannot prohibit them by legislation, its courts cannot do so in the absence of legislation. It may do so, all will admit, so far, at least, as the United States is concerned, if in doing so no power confided to the general government is invaded thereby. It goes without saying that "no state can exercise power over a subject confided exclusively to congress by the federal constitution. It cannot invade the domain of the national government." Railroad Co. v. Husen, 95 U. S. 471. Let us, therefore, examine more analytically the allegations in the bill describing the class of persons it is sought to prohibit being imported into the state. They are "armed men of the low and lawless type." How are they armed? The bill does not say. The allegation is broad enough to cover all kinds of arms. Article 2, Amend. Const. U. S., declares that, "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." Section 5, art. 2, of the present constitution of this state declares that "the citizens of this state shall have the right to keep and bear arms for their common defense." In Cooley, Torts, p. 301, the author says:

"No military or civil law can take from the state the right to bear arms for the common defense. This is an inherited and traditional right, guarantied also by state and federal constitutions. But it extends no further than to

keep and bear those arms which are suited and proper for the general defense of the community against invasion and oppression, and it does not include the carrying of such weapons as are specially suited for deadly individual encounters."

This same doctrine has been recognized by the supreme court of this state in Fife v. State, 31 Ark. 455. The above amendment to the constitution of the United States, however, is a restraint upon federal, and not upon state, legislation. Id. 458. It will be seen by an examination of this case that it is a constitutional right of the citizens of this state, recognized by the court, that the citizens thereof shall have the right to keep and bear arms; and it is also seen from the above amendment to the constitution of the United States that the federal government is denied the power to deprive the people of the right to keep and bear arms. By the fourteenth amendment to the constitution of the United States, "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." By this amendment to the constitution of the United States a citizen of another state is guarantied all the rights and privileges of the citizens of this state, and every state is forbidden to make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, or deny to any person within its jurisdiction the equal protection of the laws. One of the rights, as we have seen, guarantied by the constitution of this state to all of its citizens, is that they shall have the right to keep and bear arms for their common defense. If this right belongs to the citizens of this state under the fourteenth amendment, can the state pass any law which shall deprive citizens of other states of the same right, under the same circumstances? It has not done so. There is no such statute. Is it not, therefore, one of the unavoidable questions in controversy in this suit as to whether or not the state has the power to prohibit men who are armed coming into the state? It must be remembered that there is no allegation in the bill that these men are armed, or banded together, coming or being imported into the state for the purpose of invading it, or violating any of the laws thereof, or that their purpose is in any respect a violation of any of the laws of the state. But these armed men are described in the bill to be "of the low and lawless type." Let us examine what is meant by these words "low and lawless." The Century Dictionary defines "low" as "not high in character or condition; not haughty or proud; meek; lowly; lacking in dignity, refinement, or principle; vulgar, groveling, abject, mean, base; in a mean condition, as 'a low born fellow.'" The word "lawless" is defined by the Century Dictionary as "not subject or submissive to law; uncontrolled by law, whether natural, human, or divine." The question therefore arises whether it is within the power of the state to prohibit the class of persons thus described, while armed, coming or being brought

into the state.   No statute has been enacted to that effect.   In Buell v. State, 45 Ark. 338, the supreme court said:

"It may be doubted whether it is competent for the legislature to authorize a town council to proscribe any particular class of people against whom no overt act is charged, although in Shafer v. Mumma, 17 Md. 331, such a power, expressly conferred in the charter of Haggerstown, was sustained.   Possibly the right to live in a given community is a common right of which a person cannot be deprived, however degraded and subversive of good morals his occupation may be,"—citing Milliken v. City Council, 54 Tex. 388.

In re Ah Fong, 1 Fed. Cas. 213, is a case where a Chinese woman sued out a writ of habeas corpus in the circuit court of the United States for the district of California.   She had been brought to San Francisco as a passenger, and, under a statute of California, had been declared by a commissioner of that state to be "a lewd and debauched woman," and was prohibited from landing in the state of California, and was remanded to the custody of the steamship to be transported beyond the state.   She sued out a writ of habeas corpus before the state district court of California, and the writ was dismissed.   It was appealed to the supreme court of California, and the judgment of the district court affirmed.   She then sued out a writ of habeas corpus to the circuit court of the United States, as above stated.   Mr. Justice Field delivered the opinion of the court, and in that case said:

"It is undoubtedly true that the police power of the state extends to all matters relating to the internal government of the state, and the administration of its laws, which have not been surrendered to the general government, and embraces regulations affecting the health, good order, morals, peace, and safety of society.   Under this power all sorts of restrictions and burdens may be imposed, having for their object the advancement of the welfare of the people of the state; and when these are not in conflict with established principles, or any constitutional prohibition, their validity cannot be questioned. It is equally true that the police power of a state may be exercised by precautionary measures against the increase of crime or pauperism, or the spread of infectious diseases from persons coming from other countries; that the state may entirely exclude convicts, lepers, and persons affected with incurable disease; may refuse admission to paupers, idiots, lunatics, and others, who, from physical causes, are likely to become a charge upon the public until security is afforded that they will not become such a charge; and may isolate the temporarily diseased until the danger of contagion is gone.   The legality of precautionary measures of this kind has never been doubted.   The right of the state in this respect has its foundation, as observed by Mr. Justice Grier, in the Passenger Cases, 7 How. 462, in the sacred law of self-defense, which no power granted to congress can restrain or annul.   *   *   *   Where the evil apprehended by the state from the ingress of foreigners is that such foreigners will disregard the laws of the state, and thus be injurious to its peace, the remedy lies in the more vigorous enforcement of the laws, not in the exclusion of the parties.   Gambling is considered by most states to be injurious to the morals of their people, and is made a public offense.   It would hardly be considered as a legitimate exercise of the police power of the states to prevent a foreigner who had been a gambler in his own country from landing in ours. If, after landing, he pursued his former occupation, fine him, and, if he persisted in it, imprison him, and the evil will be remedied.   In some states the manufacture and sale of spirituous and intoxicating liquors are forbidden and punished as a misdemeanor.   If the foreigner coming to our shores is a manufacturer and dealer in such liquors, it would be deemed an illegitimate exercise of the police power to exclude him, on account of his calling, from the state.   The remedy against any apprehended manufacture and sale would lie, in such case, in the enforcement of the penal laws of the state.   So, if lewd

women, or lewd men, even if the parties be of that baser sort who, when Paul preached at Thessalonica, set all the city in an uproar (Acts xvii., verse 5), land on our shores, the remedy against any subsequent lewd conduct on their part must be found in good laws or municipal regulation and a vigorous police. It is evident that, if the possible violations of the laws of the state by an immigrant, or the supposed immorality of his past life or profession, where that immorality has not already resulted in a conviction for a felony, is to determine his right to land and to reside in the state, or to pass through into other and interior states, a door will be opened to all sorts of oppression. The doctrine now asserted by counsel for the commissioner of immigration, if maintained, would certainly be invoked, and at no distant day, when other parties, besides low and despised Chinese women, are the subjects of its application, and would then be seen to be a grievous departure from principle. I am aware of the very general feeling prevailing in this state against the Chinese, and in opposition to the extension of any encouragement to their immigration hither. It is felt that the dissimilarity in physical characteristics, in language, in manners, religion, and habits, will always prevent any possible assimilation of them with our people. Admitting that there are grounds for this feeling, it does not justify any legislation for their exclusion which might not be adopted against the inhabitants of the most favored nation of the Caucasian race and of Christian faith. If their further immigration is to be stopped, recourse must be had to the federal government, where the whole power over this subject lies. The state cannot exclude them arbitrarily, nor accomplish the same end by attributing to them a possible violation of its municipal laws. It is certainly desirable that all lewdness, especially when it takes the form of prostitution, should be suppressed, and that the most stringent measures to accomplish that end should be adopted. But I have little respect for that discriminating virtue which is shocked when a frail child of China is landed on our shores, and yet allows the bedizened and painted harlot of other countries to parade our streets and open her hells in broad day, without molestation, and without censure.  *  *  *  And the power of exclusion by the state, as we have already said, extends only to convicts, lepers, and persons incurably diseased, and to paupers and persons who, from physical causes, are likely to become a public charge. The detention of the petitioner is therefore unlawful under the treaty. But there is another view of this case equally conclusive for the discharge of the petitioner, which is founded upon the legislation of congress since the adoption of the fourteenth amendment. That amendment, in its first section, designates who are citizens of the United States, and then declares that no state shall make or enforce any law which abridges their privileges or immunities. It also enacts that no state shall deprive 'any person' (dropping the distinctive designation of 'citizen') of life, liberty, or property, without due process of law, nor deny to any person the equal protection of the laws. The great fundamental rights of all citizens are thus secured against any state deprivation, and all persons, whether native or foreign, high or low, are, whilst within the jurisdiction of the United States, entitled to the equal protection of the laws. Discriminating and partial legislation, favoring particular persons or against particular persons of the same class, is now prohibited. Equality of privilege is the constitutional right of all citizens, and equality of protection is the constitutional right of all persons. And equality of protection implies not only equal accessibility to the courts for the prevention or redress of wrongs and the enforcement of rights, but equal exemption with others of the same class from all charges and burdens of every kind. Within these limits the power of the state exists, as it did previously to the adoption of the amendment, over all matters of internal police."

Another case—that of Chy Lung v. Freeman, 92 U. S. 275—of the same nature and class as the Ah Fong Case, and originating under the same California statute, came before the supreme court of the United States, and Mr. Justice Miller, in holding that class of legislation void, says:

"The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to congress, and not to the states.

It has the power to regulate commerce with foreign nations. The responsibility for the character of those regulations, and for the manner of their execution, belongs solely to the national government. If it be otherwise, a single state can, at her pleasure, embroil us in disastrous quarrels with other nations. We are not called upon by this statute to decide for or against the right of a state, in the absence of legislation by congress, to protect herself by necessary and proper laws against paupers and convicted criminals from abroad, nor to lay down the definite limit of such right, if it exist. Such a right can only arise from a vital necessity for its exercise, and cannot be carried beyond the scope of that necessity. When a state statute limited to provisions necessary and appropriate to that object alone shall, in a proper controversy, come before us, it will be time enough to decide that question."

This legislation is held void under the interstate commerce clause of the constitution, which provides that congress shall have power "to regulate commerce with foreign nations and among the several states, and with the Indian tribes."

In the case of Railroad Co. v. Husen, supra, the court, after referring to the Chy Lung Case and the Passenger Cases, said:

"These cases, it is true, speak only of laws affecting the entrance of persons into a state, but the constitutional doctrines they maintain are equally applicable to interstate transportation of property. They deny validity to any state legislation professing to be an exercise of police power for protection against evils from abroad which is beyond a necessity for its exercise wherever it interferes with the rights and powers of the federal government."

Bowman v. Railway Co., 125 U. S. 465, 8 Sup. Ct. 689, 1062, is a case where Bowman sued the railroad company for refusing to convey a large lot of beer into Iowa in violation of a statute of that state. The supreme court of the United States reviewed all the decisions touching the police power of a state and the power of congress to regulate interstate commerce, and in referring to the State Freight Tax Case, 15 Wall. 279 (quoting from Mr. Justice Strong, speaking for the court), said:

" 'Cases that have sustained state laws alleged to be regulations of commerce among the states have been such as related to bridges or dams across streams wholly within a state, police or health laws, or subjects of a kindred nature, not strictly of commercial regulations. The subjects were such as in Gilman v. Philadelphia, 3 Wall. 713, it was said "can be best regulated by rules and provisions suggested by the varying circumstances of different localities, and limited in their operations to such localities respectively." However this may be, the rule has been asserted with great clearness that whenever the subjects over which a power to regulate commerce is asserted are in their nature national, or admit of one uniform system or plan of regulation, they may justly be said to be of such a nature as to require exclusive legislation by congress. Cooley v. Board, 12 How. 299; Crandall v. Nevada, 6 Wall. 42. Surely, transportation of passengers or merchandise through a state, or from one state to another, is of this nature. It is of national importance that over that subject there should be but one regulating power, for, if one state can directly tax persons or property passing through it, or tax them indirectly by levying a tax upon their transportation, every other may, and thus commercial intercourse between states remote from each other may be destroyed. The produce of Western states may thus be effectually excluded from Eastern markets, for, though it might bear the imposition of a single tax, it would be crushed under a load of many. It was to guard against the possibility of such commercial embarrassments, no doubt, that the power of regulating commerce among the states was conferred upon the federal government.' * * * The power conferred upon congress to regulate commerce among the states is, indeed, contained in the same clause of the constitution which confers upon it power to regulate commerce with foreign nations. The grant is conceived in

the same terms, and the two powers are undoubtedly of the same class and character, and equally extensive. The actual exercise of its power over either subject is equally and necessarily exclusive of that of the states, and paramount over all the powers of the states; so that state legislation, however legitimate in its origin or object, when it conflicts with the positive legislation of congress, or its intention reasonably implied from its silence, in respect to the subject of commerce of both kinds, must fail. And yet, in respect to commerce among the states, it may be, for the reason already assigned, that the same inference is not always to be drawn from the absence of congressional legislation as might be in the case of commerce with foreign nations. The question, therefore, may be still considered in each case, as it arises, whether the fact that congress has failed in the particular instance to provide by law a regulation of commerce among the states is conclusive of its intention that the subject shall be free from all positive regulation, or that, until it positively interferes, such commerce may be left to be freely dealt with by the respective states."

In the same opinion, discussing the State Freight Tax Case, 15 Wall. 232, they say:

"If the state has no power to tax freight and passengers passing through it, or to or from it, from or into another state, much less would it have the power directly to regulate such transportation, or to forbid it altogether. * * * It may be material also to state in this connection that congress had legislated on the general subject of interstate commerce by means of railroads prior to the date of the transaction on which the present suit is founded. Section 5258 of the Revised Statutes provides that 'every railroad company in the United States whose road is operated by steam, its successors and assigns, is hereby authorized to carry upon and over its road, boats, bridges, and ferries all passengers, troops, government supplies, mails, freight, and property on their way from any state to another state, and to receive compensation therefor, and to connect with roads of other states, so as to form continuous lines for the transportation of the same to the place of destination.' In the case of Railroad Co. v. Richmond, 19 Wall. 584, this section, then constituting a part of the act of congress of June 15, 1866, was considered. Referring to this act and the act of July 25, 1866, authorizing the construction of bridges over the Mississippi river, the court say: 'These acts were passed under the power vested in congress to regulate commerce among the several states, and were designed to remove trammels upon transportation between different states which had previously existed, and to prevent a creation of such trammels in future, and to facilitate railway transportation, by authorizing the construction of bridges over the navigable waters of the Mississippi. But they were intended to reach trammels interposed by state enactments or by existing laws of congress. * * * The power to regulate commerce among the several states was vested in congress in order to secure equality and freedom in commercial intercourse against discriminating state legislation.' Page 589. Congress had also legislated on the subject of the transportation of passengers and merchandise in chapter 6, tit. 48, of the Revised Statutes; sections 4252–4289, inclusive, having reference, however, mainly to transportation in vessels by water. But sections 4278 and 4279 relate also to the transportation of nitroglycerine and other similar explosive substances by land or water, and either as a matter of commerce with foreign countries or among the several states. Section 4280 provides that 'the two preceding sections shall not be so construed as to prevent any state, territory, district, city, or town within the United States from regulating or from prohibiting the traffic in or transportation of those substances between persons or places lying or being within their respective territorial limits, or from prohibiting the introduction thereof into such limits for sale, use or consumption therein.' So far as these regulations made by congress extend, they are certainly indications of its intention that the transportation of commodities between the states shall be free, except where it is positively restricted by congress itself, or by the states in particular cases by the express permission of congress."

Also (page 702, 102 U. S., Mobile Co. v. Kimball):

"Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities. For the regulation of commerce, as thus defined, there can be only one system of rules applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon it by separate states is not, therefore, permissible."

Further on in the same case the court say:

"In the present case the defendant is sued as a common carrier in the state of Illinois, and the breach of duty alleged against it is a violation of the law of that state in refusing to receive and transport goods, which, as a common carrier, by that law, it was bound to accept and carry. It interposes as a defense a law of the state of Iowa, which forbids the delivery of such goods within that state. Has the law of Iowa any extraterritorial force which does not belong to the law of the state of Illinois? If the law of Iowa forbids the delivery, and the law of Illinois requires the transportation, which of the two shall prevail? How can the former make void the latter? In view of this necessary operation of the law of Iowa, if it be valid, the language of this court in the case of Hall v. De Cuir, 95 U. S. 485, 488, is exactly in point. It was there said: 'But we think it may safely be said that state legislation which seeks to impose a direct burden upon interstate commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of congress. The statute now under consideration, in our opinion, occupies that position.'"

And on page 490, 125 U. S., and page 701, 8 Sup. Ct., of the same case, is the following:

"'The exclusive state power is made to rest, not on the fact of the state or condition of the article, nor that it is property usually passing by sale from hand to hand, but on the declaration found in the state laws, and asserted as the state policy, that it shall be excluded from commerce. And by this means the sovereign jurisdiction in the state is attempted to be created in a case where it did not previously exist. If this be the true construction of the constitutional provision, then the paramount power of congress to regulate commerce is subject to a very material limitation, for it takes from congress, and leaves with the states, the power to determine the commodities or articles of property which are the subject of lawful commerce. Congress may regulate, but the states determine what shall or shall not be regulated. Upon this theory the power to regulate commerce, instead of being paramount over the subject, would become subordinate to the state police power; for it is obvious that the power to determine the articles which may be the subjects of commerce, and thus to circumscribe its scope and operation, is, in effect, the controlling one. The police power would not only be a formidable rival, but, in a struggle, must necessarily triumph over the commercial power, as the power to regulate is dependent upon the power to fix and determine upon the subjects to be regulated. The same process of legislation and reasoning adopted by the state and its courts could bring within the police power any article of consumption that a state might wish to exclude, whether it belonged to that which was drank, or to food and clothing, and with nearly equal claims to propriety, as malt liquors and the produce of fruits other than grapes stand on no higher ground than the light wines of this and other countries, excluded, in effect, by the law as it now stands. And it would be only another step to regulate real or supposed extravagance in goods and clothing.'"

And on page 495, 125 U. S., and page 703, 8 Sup. Ct., the court say:

"In Brown v. Houston, 114 U. S. 622, 630, 5 Sup. Ct. 1091, 1095, it was declared that the power of congress over commerce among the states 'is certainly

so far exclusive that no state has power to make any law or regulation which will affect the free and unrestrained intercourse and trade between the states as congress has left it, or which will impose any discriminating burden or tax upon the citizens or products of other states coming or brought within its jurisdiction. All laws and regulations are restrictive of natural freedom to some extent, and, where no regulation is imposed by the government which has the exclusive power to regulate it, it is an indication of its will that the matter shall be left free. So long as congress does not pass any law to regulate commerce among the several states, it thereby indicates its will that that commerce shall be free and untrammeled, and any regulation of the subject by the states is repugnant to such freedom. This has been frequently laid down as law in the judgments of this court.' "

It will be observed that no overt act is charged against any of the class of persons threatened and about to be imported by the defendant Coal Company over the defendant Railroad Company's lines. They are not alleged to be convicts or ex-convicts, nor are they alleged to be paupers, idiots, insane, or diseased persons. They are said to be "armed," and to belong to the "low and lawless type of humanity"; not that they are low and lawless themselves, but are of that type. No statute of this state condemns the coming of such men hither. No expression of the legislative will relating to that class of men coming into the state has found a place in our laws. They are silent on the subject. It will be time enough to decide whether the state has the power to prohibit them coming when a proper case, based on such a statute, is brought to the attention of the court. It is enough now to say that, under the fourteenth amendment, and under the commerce clause of the constitution, they now have that right. If they have the right to come, then the Coal Company has a right to import them, with their consent, and the Railroad Company has the right to transport them, with their consent. It is not pretended that they are being brought here by force. In the opinion of the court it is not within the power of any court, state or federal, to prescribe what rules and regulations are needful to the welfare, peace, health, safety, and morals of the state, or to determine, without legislation, what class or classes of persons may lawfully come thereto. That power belongs to the legislatures of the states, and must be exercised within constitutional bounds.

It remains to be added that it has been repeatedly held that a corporation is a person, within the meaning of the fourteenth amendment to the constitution. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418; Santa Clara Co. v. Southern Pac. R. Co., 118 U. S. 394, 6 Sup. Ct. 1132; Railroad Co. v. Gibbs, 142 U. S. 386, 12 Sup. Ct. 255; Railroad Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255.

It is vain to pursue this investigation further. I cannot avoid the conclusion, in view of the authorities from which I have quoted, that, on the face of the plaintiff's complaint, it appears that a construction of the interstate commerce clause and of the fourteenth amendment to the constitution of the United States are both involved (necessarily so), and would also be involved even if this bill were based on a statute of this state covering the class of persons designated in the bill, and that a correct determination of the case makes it necessary to construe those provisions of the constitution

of the United States, and that the construction placed upon them must necessarily settle the controversy. This conclusion determines the fate of the motion. It is overruled.

From the conclusions arrived at by the court, it is obvious that the injunction in this case must be dissolved. No amount of proof that might be offered could possibly change the result already reached.

It was urged upon the argument that this court had no supervisory control over the action of the state court. That is true; but when this case is removed from the state court into this court it stands here for hearing and determination precisely as if it had been originally brought here, and it will not be contended that, if this court had committed an error in granting an injunction in a given case, when it was so made to appear it could not reverse its action, and dissolve it. The same would be true if the bill were in the state court. The motion, therefore, to dissolve the injunction will be sustained.

The other motion—restraining the plaintiff from the prosecution of this suit in the state court—will not be entertained. If the state sees fit to continue the prosecution of this case in the state court, it will be permitted to do so, so long as in its prosecution it does not interfere with the relief granted the defendants in this suit in this court. It is proper to say that I have given this last question no consideration other than such as is involved in the proprieties of the case. In short, I have not determined that this court has not the power to stay the suit in the state court, but only that the state may, so far as this court is concerned, if it sees fit, proceed with the prosecution of the suit in its own court. The motion, therefore, to enjoin the prosecution of the suit in the state court, will be overruled.